## THE STATE v. SPENCER JORDAN, Appellant.

### In Banc, December 18, 1924.

1. **MURDER: Instruction for Second Degree.** Where the State's evidence shows that a police officer, accompanied by three others, in civilian clothing and with nothing in his dress or on his person to indicate his character, approached defendant at a relatively dark place on a public street and began to feel about his person, and in the shooting that followed one of the other officers was killed, an instruction on murder in the second degree should have been given; for, if this was all that happened, the search of defendant's person was an assault. And the fact that said officer testified that he exhibited his star and announced that he was an officer, if denied, does not change the fact that, under such circumstances, an instruction for murder in the second degree was required, for the jury were to decide whether they believed the officer's testimony.

2. ————: ————: **Defense of Self-Defense.** Where from the State's evidence the jury could have found circumstances justifying a verdict of murder in the second degree, a failure to give an instruction on that subject cannot be excused by the fact that defendant testified he shot in self-defense. The jury had a right to disbelieve his testimony, and therefore it cannot be ruled that no finding of murder in the second degree was possible.

3. **INSTRUCTION: Assumption of Fact.** An instruction for the State on the subject of flight which says that "if the jury find and believe from the evidence that, after the shooting of Michael Finn, alleged in the indictment, the defendant fled from his usual place of abode, for the purpose of avoiding arrest and trial for said offense," assumes that defendant shot Michael Finn, and in doing so is guilty of a crime, and its giving was reversible error, where the shooting of Michael Finn was "alleged in the indictment" to have been murder in the first degree and defendant made no judicial admission that he did it.

4. ————: **Flight: Comment on Evidence.** The mere fact that the instruction deals with flight does not make it a comment on the evidence. To tell the jury that flight raises a presumption of guilt is a comment, for it directly tells them the evidence has a designated weight. But an instruction on flight that deals with the subject in proper language is not an unwarranted comment.

5. ————: **Right to Arrest Upon Suspicion.** An instruction telling the jury that a police officer has a right to arrest without a warrant for any offense, though not committed in his presence, "if he has reasonable grounds to suspect the person arrested is the perpetrator of a crime," is error, where there is no evidence tending to prove that, prior to the time the officer accosted the defendant, either defendant or his associate had committed any crime or that any crime had been committed; and especially is such an instruction unwarranted where there is no evidence of an effort, in the usual sense, to arrest the two, and at no time did the officers, prior to the shooting, say to either of them that he was under arrest. Such an instruction, under such circumstances, brings into the case a suggestion which the testimony does not warrant, and is, at best, an abstraction.

6. ————: **Minimizing Right of Self-Defense: Apprehended Danger of Bodily Harm.** An instruction on behalf of the State, in the trial of defendant upon a charge of murdering a police officer, which tells the jury that, "before you can acquit the defendant upon the ground of self-defense, you must believe and find from the evidence that the defendant had reasonable cause to apprehend that the deceased and others acting with him were about to hold him up or to rob him or to do him some great bodily harm, and that such danger was imminent and impending, and that it was necessary for defendant to so use his said pistol in the way he did in order to protect himself from said danger, and unless you so believe you will find defendant guilty," being complete in itself, minimizes defendant's right of self-defense, and is error unless another instruction, asked by defendant, is given, which, in substance, tells the jury

State v. Jordan.

that defendant was entitled to act upon appearances and had rea-
sonable cause to believe he was in danger of bodily harm. [Follow-
ing State v. Hollingsworth, 156 Mo. 1. c. 187.]

7. ———: ———: ———: From Deceased and Others Acting with
Him. Where the evidence would have justified a finding that de-
fendant never saw deceased at all, and there was substantial evi-
dence that, at the time the shooting occurred, which was at a dark
place in the night time, three of the four officers were not near de-
fendant and one of them at least twelve feet away, and that de-
fendant supposed them to be highwaymen, an instruction for the
State, telling the jury that, before they could acquit defendant on
the ground of self-defense, they must find that he had "reasonable
cause to apprehend that deceased and others acting with him were
about to hold him up or rob him," etc., was error, for it denied the
right of self-defense unless defendant apprehended danger from
deceased and, also, simultaneously, from others "acting with him."

Citations to Headnotes:  1 and 2, Homicide, 30 C. J. par. 650; 3 and 4,
Criminal Law, 16 C. J. pars. 2330, 2349; 5, 6 and 7, Homicide, 30 C. J.
pars. 617, 623.

Appeal from St. Louis City Circuit Court.—*Hon. Wil-
liam H. Killoren*, Judge.

REVERSED AND REMANDED.

*Freeman L. Martin* and *Verne Lacy* for appellant;
*John A. Moore* of counsel.

(1)  The court erred in admitting over the objection
and exception of appellant the so-called confession.  A
confession, to be admissible, as such, must be an
admission by the accused that he is guilty of the
precise crime with which he is charged.  The prisoner's
declaration that he is guilty of other similar crimes
never amounts to a confession of the crime for which
he is indicted, nor do the rules and principles regulat-
ing the confessions apply to such declarations.  Hardtke
v. State, 30 N. W. (Wis.) 723; People v. Hickman, 45
Pac. (Colo.) 175.  Declaration by the accused of an
intention to commit separate offenses from that charged
are not confessions.  Kinchlow v. State, 5 Humph.
(Tenn.) 9.  (2)  The court erred in failing to give the
jury an instruction on second-degree murder.  (a)  The

evidence in this case shows that the offense was either murder in the first degree, murder in the second degree, self-defense, or it was accidental. State v. Kilgore, 70 Mo. 547; State v. Ellis, 74 Mo. 207; State v. Johnson, 76 Mo. 121; State v. Snell, 78 Mo. 240; State v. Jones, 79 Mo. 441; State v. Kyles, 247 Mo. 640; State v. Wyatt, 50 Mo. 309; State v. Bargan, 82 Mo. 67. (b) Defendant was entitled to an instruction on second-degree murder, even though based on his own unsupported testimony. State v. Darling, 199 Mo. 197; State v. Fredericks, 136 Mo. 51; State v. Anderson, 86 Mo. 319; State v. Partlow, 90 Mo. 608; State v. Arnett, 258 Mo. 260; State v. Weinhardt, 253 Mo. 629; State v. Bidstruff, 237 Mo. 273; State v. Richardson, 194 Mo. 344; State v. McKinzie, 102 Mo. 620; State v. Banks, 73 Mo. 592; State v. Brown, 104 Mo. 373; State v. Branstetter, 65 Mo. 149; State v. Murphy, 118 Mo. 20. (c) Whatever grades of the crime defendant's testimony may tend to prove should be covered by instructions, although his evidence may not be true. State v. Heath, 221 Mo. 565; State v. Palmer, 88 Mo. 573; State v. Turlington, 102 Mo. 642; State v. Crabtree, 111 Mo. 136; State v. Fairlamb, 121 Mo. 137.

*Jesse W. Barrett*, Attorney-General, *Robert W. Otto*, Assistant Attorney-General, for respondent.

(1) The court did not err in admitting in evidence the written confession or statement made by the defendant. (a) A confession to be inadmissible must be made to an officer of the law, in consequence of improper influence exerted by him, and if no threat of harm or promise of worldly advantage be made by such officer, or by the master of the accused when directly concerned, the confession is admissible. State v. Lee, 288 Mo. 41; State v. Meyer, 293 Mo. 108. (b) Appellant's denial of his confession or that violence was used to extort it did not overcome the prima-facie case made by the State's evidence; and it became a question for the jury. State v. Church, 199 Mo. 605; State v. Spaugh, 200 Mo.

571; State v. Brooks, 220 Mo. 74; State v. Meyer, 293 Mo. 108; State v. Reich, 293 Mo. 415. (2) An instruction will not be given authorizing a jury to acquit a defendant or reduce the grade of the offense on the testimony of the defendant which is contrary to the physical facts. State v. Vaughan, 200 Mo. 1; State v. Tucker, 232 Mo. 1. (3) The court did not err in giving the State's instruction properly defining what authority a police officer of the city of St. Louis has to make arrests without a warrant. Hanser v. Bieber, 271 Mo. 326. (4) The court did not err in giving the State's instruction on self-defense. It contains all the necessary elements to present the question of self-defense. State v. Tooker, 188 Mo. 438; State v. Miles, 253 Mo. 427. (5) Instructions similar to the instruction on flight have been approved by this court. The rule in this State has been, until the cases of State v. Swarens, State v. Campbell and State v. Hogan, that flight raises a presumption of guilt, although some decisions of this court approved instructions to the effect that flight to avoid arrest and prosecution is only a circumstance to be taken into account and given such weight as the jury deem proper from all the facts and circumstances in the case. State v. Griffin, 87 Mo. 608; State v. Moore, 101 Mo. 316; State v. Kyles, 247 Mo. 640. The instruction does not come within the rule laid down in the Swarens, Campbell and Hogan cases, in that it does not declare that flight is a presumption of guilt. State v. Swarens, 294 Mo. 139; State v. Hogan, 252 S. W. 389; State v. Campbell, 257 S. W. 133. If the decisions in the Swarens, Hogan and Campbell cases are to be interpreted to hold that the fact of flight may not be made the subject of comment by the court in its instruction to the jury in order to advise them of the purpose and effect of such evidence, then it was error for the court to so instruct. (6) The court did not err in failing to instruct on murder in the second degree. (a) The testimony establishes a deliberate and premeditated murder, and there is no basis for an instruction on murder in the second degree. State v.

Moore, 235 S. W. 1058; State v. Barrington, 198 Mo. 103; State v. Lewis, 273 Mo. 518; State v. Hopper, 71 Mo. 425; State v. Underwood, 75 Mo. 230; State v. Cushenberry, 157 Mo. 168; State v. Tettaton, 159 Mo. 354; State v. Evans, 161 Mo. 95; State v. Craft, 164 Mo. 631; State v. Sassaman, 214 Mo. 695; State v. Sartino, 216 Mo. 408; State v. Rumfelt, 228 Mo. 443; State v. Rasco, 239 Mo. 535; State v. Carroll, 288 Mo. 392. (b) There was sufficient deliberation on the part of the defendant at the time of the killing to constitute murder in the first degree. State v. Dunn, 18 Mo. 419; State v. Starr, 38 Mo. 270.

JAMES T. BLAIR, J.—By the indictment appellant and Henry Page were jointly charged with having killed Michael Finn on May 23, 1921. Page pleaded guilty to a charge of murder in the second degree and was sentenced to ten years' imprisonment in the penitentiary. Appellant was not apprehended until in 1922. He pleaded not guilty, and, subsequently, was permitted to withdraw that plea and file a "motion to dismiss and discharge the jury panel selected, listed and drawn and impaneled for the trial" of the cause. This motion was overruled and, on second arraignment, appellant again pleaded not guilty. A trial of this issue was had on April 20, 1922, and the jury returned a verdict of guilty of murder in the first degree and fixed the punishment at death. In due time a motion for new trial was filed. This motion was overruled at the December term, 1922. Appellant was sentenced on the verdict on December 19, 1922, and appealed. On application he was permitted to prosecute his appeal in forma pauperis. The bill of execeptions was filed June 1, 1923, and the transcript was filed in this court on October 4, 1923. The cause was heard in Division Two of this court and an opinion was handed down June 5, 1924. From this opinion one of the judges dissented and the case was transferred to Court in Banc. In Court in Banc the cause was argued at the October term, 1924, and thereafter the opinion

of Division Two, after consideration by Court in Banc, failed of adoption, and the cause was reassigned on November 25, 1924.

The evidence for the State tends to prove that on the night of the killing Lieut. Fleming and officers Flynn, Bobbitt and Finn were on a tour of inspection in the neighborhood of Olive and Whittier streets in St. Louis. After some preliminary matters, which it is not necessary to detail, and on the suggestion of one of their number, they started north from Olive on the east side of Whittier Street. They seem to have then had no particular place or person in view for investigation. Fleming and Finn went first and then, six or eight feet behind them, Flynn and Bobbitt came. Flynn, Bobbitt and Finn were in civilian's garb, and there was nothing about their dress to indicate they were officers. Fleming was in uniform. The four walked north and, at a point about 100 or 110 feet north of Olive, Flynn, one of the second couple, descried two persons, coming south on the west side of Whittier Street, who had then reached a point some forty, fifty or sixty feet north of an alley which ran west from Whittier about 150 feet north of Olive. The paved roadway of Whittier Street was thirty-five feet wide. Flynn testified he said to himself, "I am going over after them." Fleming says Flynn said: "There are two colored men; I am going over." As to his reason for "going over after them," Flynn testified:

"Q. And now just tell the jury what they were doing when you saw them all the way down? A. Just walking along, both of them.

"Q. That is no side street, that is a public thoroughfare? A. It is a public thoroughfare, yes, sir.

"Q. And there was nothing in the place where they were that attracted your attention, was there? Nothing in the place where they were that attracted your attention? A. No, sir.

"Q. Was there anything that they were doing that attracted your attention? A. No, just outside of their actions, the way they walked along.

"Q. Just a minute —

"Mr. Bowcock: Let him explain.

"By Mr. Martin: Q. Did you hear them say any-anything? A. No, sir.

"Q. So there was nothing as to the place where you saw them nor in their demeanor, in their action or words, that attracted your attention? A. Well, it would be pretty hard to explain why I went over to them. It was just their actions, that is all, that made me go across.

"Q. But they were just going up the street like two other men would come up the street? A. Yes, sir.

"Q. In other words, they were just demeaning themselves on the street the same as you officers were, just walking along? A. Yes, sir.

"Q. And was there anything in their dress that caused special attention to them, the way they were dressed on that occasion? A. No, I wouldn't say that.

"Q. There wasn't anything? A. No.

"Q. In other words, you just tell me and want the jury to understand that you thought you would go over and see what you could find out? A. I just thought I would do what I was doing all the time, every day and every night.

"Q. You have passed other people, haven't you, on public streets just like that? A. Not if I thought they were wrong, if I thought from their actions there was something wrong with them.

"Q. That is what I am getting you to tell the jury now: Was there anything in the actions or dress or their demeanor or anything that they were doing that made you think they were wrong? A. Well, yes, I will say yes.

"Q. All right. Now tell the jury what it was that you saw? A. Just from their actions, the way they were walking along there just a little bit before.

"Q. Tell how they were walking? A. Just walking along the same as anybody else. As I said, I can't explain why I went over to them no more than I tackle anybody else or approach anybody else.

"Q. What I want the jury to know is, were they doing anything or saying anything out of the way? A. No, sir.

"Q. Like gentlemen on the street? A. I couldn't say that. I said nothing.

"Q. Had you stopped everybody on the street who were deporting themselves as you saw this defendant deporting himself, had you stopped other people on the street for the same reason that evening? A. Not that evening, no.

"Q. Had you stopped anybody that evening at all? A. No, sir. . . .

"Q. And you say at the time you approached them they were not making any disturbance, not violating the law in any way, were they? A. No."

With respect to the same circumstances Fleming said:

"Q. Just tell what these two colored men were doing when you saw them? A. Why, they were walking side by side south on the west side of Whittier Street.

"Q. Were they doing anything else besides walking? A. That is all they were doing.

"Q. Do you remember how they were dressed? A. Yes, sir.

"Q. How were they dressed? A. This man here had on spiral leggings, his legs were wrapped. He had on a soldier's uniform and khaki trousers, a soldier's shirt and a little dark cap.

"Q. Was there anything out of the ordinary in his dress? A. Nothing out of the ordinary.

"Q. That is all I want to know. Was there anything out of the ordinary in his conduct as you saw him? A. Nothing whatever.

"Q. Did you hear him say anything or hear them say anything? A. Not a word.

"Q. You say you have been an officer twenty-eight years? A. Yes, sir.

"Q. Would you say they were deporting themselves as gentlemen on the street?

"Mr. Bowcock: One moment, that calls for a conclusion and is incompetent.

"The Court: Objection sustained.

"By Mr. Martin: Q. I say, would you say they were deporting themselves in a lawful manner on the street?

"Mr. Bowcock: Same objection, Your Honor.

"The Court: Same ruling; objection sustained.

"By Mr. Martin: Q. Were they doing anything or saying anything or were they in a place that would attract your attention as being suspicious? A. Yes, sir.

"Q. I had three things there, was it the place they were in that made them suspicious? Just answer yes or no, officer; was it the place that they were in that was suspicious? A. Not necessarily.

"Q. All right, not necessarily. They were on a public street, were they not? A. Yes, sir.

"Q. So there was nothing about the place that made them suspicious, was there, at that time of day or night, just the place I am talking about now, officer. A. Well, I will answer it again the same way—not necessarily.

"Q. Was there anything in their conduct as you observed it suspicious, officer?

"Mr. Bowcock: Your Honor, that calls for a conclusion and is incompetent.

"The Court: He may answer.

"Mr. Bowcock: Might be suspicious in one man's eyes and not in another's.

"Mr. Martin: I am talking about the police officer's eyes now.

"The Court: He may answer.

"The Witness: Your Honor, without an explanation on my part I can't answer those questions.

"By Mr. Martin: Yes or no.

"THE COURT: You can answer the question and then explain.

"THE WITNESS: The question, please?

"MR. BOWCOCK: Read the question. (Question repeated by the reporter).

"THE WITNESS: I will say no and yes."

The testimony shows that Flynn started across the street to intercept appellant and Page who continued to walk south. Bobbitt followed Flynn across Whittier Street. They walked in a northwesterly direction. They came upon the sidewalk on the west side of Whittier Street when appellant and Page had reached a point a few feet south of the public alley. At this place the light was not good. Flynn said: "It was pretty dark; there is no light right there. . . . It is pretty dark right there; . . . could have been more light there. It was dark enough there especially." Fleming said: "Just exactly at the point where the officers stopped them, yes, it was a little inclined to be dark." Flynn testified he stepped up on the sidewalk as appellant and Page came along and to a point about two feet from them, and held out his star, which he stated he had been carrying in his pocket, and said, "Wait a minute, Buddie; I am a police officer;" that he then put his star back into his pocket. No one else spoke. Page put his hands up and appellant put his partly up. Flynn says he then said: "What have you got on you"? He testified that no one told appellant and Page to throw up their hands, but that he, Flynn, had his hand on his pistol, which seems to have been carried in front of his body in a holster; that the next thing he did was that he put his hand on appellant "and reached on one side and reached to the other." He says he was closer to appellant than to Page and just before the shooting commenced had his "hand feeling in his" (appellant's) "pocket." He also said, in another version, that: "I had my hand on my gun, and there was two of them there, one of them Page, we learned later, and Jordan, . . . and I felt him with my left hand and there was nothing on his

right side, there was nothing there, and I reached over this way . . . and took my hand off of my gun, and he reached for his and he broke away and shot me." Another: "I just simply went over and felt of Jordan on both sides, on one side first and then on the other. I turned my hand around and I felt something hard, and I said, 'What have you got there?' "Q. What did you do, did you grab for it or not? A. I took my hand off mine and held it in one hand and went to reach for it with my hand, and that is when he broke away. Q. Now, you say he broke away; what did he do? A. Well, he swung around towards the curb away from me." When Flynn reached the point at which he accosted Page and appellant, Bobbitt was about ten or twelve feet south of him. According to him appellant drew and fired as soon as Flynn put his "hand over on him like that." He inferred Flynn was starting to search appellant. Fleming says Flynn "felt the person of Jordan with his left hand" and "Jordan immediately stepped back suddenly and the shooting commenced."

When Flynn started across Whittier Street with Bobbitt, Fleming and deceased stopped. They afterward started across so that Fleming was about one-fourth of the way across and Finn was about six feet from him, ahead of him and to his left, when the first shot was fired. Neither Flynn or Bobbitt saw Fleming or Finn as they approached. The evidence tends to show appellant fired the fraction of a second before Flynn did, and his first shot inflicted a flesh wound on Flynn's arm; his second shot struck Bobbitt's leg; his third and fourth shots were directed more to the southeast, and there is testimony one of these struck and killed Finn. Meanwhile, Flynn fired three shots; Bobbitt fired five or six shots, and Fleming fired six. Appellant was retreating and fled into the alley. This shooting all occurred in a very few seconds. Flynn followed to the mouth of the alley and there Fleming passed him and exchanged shots with appellant and pursued him until he turned north through an alley and disappeared toward Washington

Avenue. The light was such that Flynn was unable to tell who it was that passed him and went into the alley after appellant, although Fleming was in uniform. Page was captured, and Finn was taken to a hospital. He had been struck in the head and had fallen four or five feet from the curb, to the southeast of the point where Flynn and appellant had first been standing.

Lieut. Vasey testified that on the night of May 23, 1921, he and two detective sergeants went to the address where appellant lived; they were looking for appellant; they went in and ran up the steps and as they reached the top two shots were fired; they didn't find appellant there.

When appellant was arrested St. Louis officers went to New Orleans to bring him back to St. Louis. There was testimony appellant was questioned there by Lieut. Vasey in the presence of several others; that appellant was "just asked if he wanted to make a statement; that he said, yes;" that he was neither threatened, promised anything nor abused nor mistreated in any way; the questions and answers were taken in shorthand and then transcribed and it was read to appellant and he then signed; that appellant was thereafter brought to St. Louis and lodged in jail and subsequently taken to the circuit attorney's office; that he was in no way mistreated or threatened, nor were any promises of immunity made him in the meantime, though he was, it seems, repeatedly questioned during this period. The circuit attorney testified that, "if I recall, I told him that any statement he might make there would be used against him at the trial," and then inquired of appellant whether he desired to make a statement, "in the light of that," and he replied that he did; that the statement made in New Orleans was then read to appellant and was then re-affirmed and again signed by him. The circuit attorney says that appellant, at that time, said he "did not know they were police officers"—referring to those on Whittier Street on the evening of May twenty-third—and maintained this after the circuit attorney had read to him

the New Orleans statement, in which it appears he said more than once he did not know they were officers, and once is reported to have answered that he found they were police officers "when he started to search me." Appellant's statement was admitted in evidence.

In this appellant told of the shooting about as he testified concerning it. In it he said that, at first, he saw only one man, who fired the first shot; that afterward two others began shooting at him, whose fire he returned as he ran. (Fleming and Bobbitt fired shots, they testified). "Q. Now, tell the truth, did you not know these men who stopped you were officers? A. No, sir; I thought they were hold-up men. Q. Did you see any officers in uniform that night? A. No, sir." He had previously, in his statement, answered the same question the same way. He was subsequently questioned about other matters and then was asked: "Did Page tell you that these men were officers, they told him of the fact? A. They may have, but Page did not tell me. Q. Then whatever Page says is a lie, then? A. I can't say. Q. How many grocery stores did you stick up with Page that night? A. I did not help to hold up any. Q. When did you find they were police officers? A. When he started to search me, I then broke and run and he fired at me and then two more men started firing and I fired back." He was asked: "Q. You had this gun on you that night to hold up people with, didn't you? A. Yes, sir." The rest of the statement need not be set out as it does not differ from appellant's testimony in any respect sufficiently to affect materially the questions decisive of the case.

Appellant testified he had come to St. Louis from Alexandria, Louisiana, and had been in the city over three years. Prior to that time he had been sentenced to a twenty-year term in the Texas penitentiary and had escaped from the guards there and made his way to Louisiana. During his stay in St. Louis he had worked a year and eleven months for one employer—firing. He worked in Granite City nine months and then worked for the

American Car & Foundry Company. He was living with Page, who was his brother-in-law. He says he and Page left their home about 7:30 P. M. on May 23, 1921, and reached Whittier Street, between Washington and Olive, about 8:30; that they were walking south on the west side of Whittier Street, and as they reached a point about a dozen feet north of the public alley he observed a man start across Whittier Street, who reached the sidewalk on the west side of Whittier just as he, appellant, and Page got across the alley; that he and Page were on their way to the car line and were walking side by side; they were doing nothing except walking along; were doing no loud talking and making no noise; that the place was dark; that just as he stepped over the alley curbstone the man who had come across Whittier and who was then about two feet away, said, "Stick them up;" that there was no other man then on the west side; two on the east side; that he saw only three altogether; that these three had on civilian's clothing and that he saw no badge or star; that the man who said, "Stick them up," then began to search him; that he, appellant, then began to run and was fired upon and returned the fire as he retreated into the alley; that he fired three shots, but doesn't know how many were fired at him; "they were all crowding in behind me; I don't know how many there was shooting;" that one shot was fired at him by some one as he went down the alley; that no one called upon him to halt; that no one of them said he was a police officer at any time; that he, appellant, did not know they were officers and would not have shot had he known it. "Q. Why did you shoot? A. Well, I thought they were highwaymen. Q. And you say he shot first? A. Yes, sir. Q. Did you think your life was in danger? A. Yes, sir. MR. BOWCOCK: One moment—— By MR. MARTIN: Q. Why did you shoot, you say? A. Because I thought they were highwaymen after killing me, that is the reason I returned the fire. Q. And were attempting to kill you? A. Yes, sir. Q. That is why you returned the fire? A. Yes,

sir. Q. Did you shoot at anybody else other than that man who first approached you? A. No, sir. Q. You saw the Lieutenant here this morning testify? A. Yes, sir. Q. Did you see him on that night? A I didn't see no one with no uniform. Q. Didn't see nobody with a uniform on? A. No, sir. Q. The men that you saw were dressed in civilian clothes? A. Yes, sir. Q. And you did not know them? A. No, sir." Appellant said it was not until his arrest in Louisiana that he learned a police officer had been killed. He said he was carrying a pistol because "there was so much highway robbery going on." He testified that he left the city and fled because he knew the shooting would get his name in the papers and that this would lead to his return to the Texas penitentiary; that he did not fire at anyone when the officers came to Page's home after the shooting, except that in leaving the house he fell out of the window and his pistol was discharged; that he heard some one coming up the stairs and didn't know who it was, but he ran "to the window and fell out" and left the city and State. He testified that after his arrest in Louisiana he was beaten and threatened until he gave desired answers, and then was told that if he did not make the same answers he would be beaten again, and it was because of this that he made the statement he signed in New Orleans; that soon after he was brought to St. Louis "about ten of the police," some in uniform and some not, took him into the basement and beat him, drew a pistol on him and "dared him even to raise his hand;" that they were trying to compel him to admit he knew Flynn and the others were officers when they approached him on Whittier Street; that Vasey inquired if any one had beaten him and he told Vasey, yes, but was afraid to tell who it was, as Vasey asked him to do; that he was afraid because they had threatened to kill him; that he was called some names in the circuit attorney's office; that he cannot write, except his name; that part only of the statement was read to him by the circuit attorney; that he pointed out several answers in the statement

that he had not made, but that he signed it because the officers had threatened to kill him and he knew he was to be returned to the station when he left the circuit attorney's office. All these charges of misconduct on the part of the officers are denied by witnesses, except the charge that appellant makes that he was threatened and beaten in New Orleans before the St. Louis officers arrived. Vasey did testify that in New Orleans appellant told him he had been "treated fine."

The instructions given contained some definitions and an instruction on murder in the first degree of the form of which no complaint seems to be made. They then proceeded:

"3. Flight of the defendant is a circumstance to be taken into consideration with all the other facts and circumstances in evidence and if the jury find and believe from the evidence that, after the shooting of Michael Finn, alleged in the indictment, the defendant fled from his usual place of abode, for the purpose of avoiding arrest and trial for said offense, and not because he was afraid that if he should be arrested here in St. Louis, Mo., he would be taken back to Texas for jail-breaking, they may take this fact into consideration in determining the guilt or innocence of the defendant so fleeing from arrest, provided you find that the defendant did flee from arrest.

"4. The court instructs the jury that under the law the police officers of the city of St. Louis may arrest without warrant for any offense, though not committed in the presence of such officer, if he has reasonable grounds to suspect the person arrested is the perpetrator of a crime.

"5. The court further instructs you that, before you can acquit the defendant upon the ground of self-defense, you must believe and find from the evidence that the defendant had reasonable cause to apprehend that the deceased and others acting with him were about to hold him up or to rob him or to do him some great bodily harm, and that such danger was imminent and im-

pending, and that it was necessary for defendant to so use his said pistol in the way he did in order to protect himself from said danger, and unless you so believe you will find the defendant guilty and assess his punishment as provided in these instructions. Whether defendant had reasonable grounds to believe that such danger existed, and whether he shot said Michael Finn in the honest belief that it was necessary for the protection of his life or property or person, are questions which you must determine from all the evidence in the case.

"And you are further instructed in this connection that, if you find and believe from the evidence that the deceased and those acting with him did not inform the defendant that he or they were police officers and that the defendant did not know that deceased or those acting with him were police officers, and that the defendant had good reason to believe and did believe, from the words, acts and conduct of the deceased and those acting with him had a design to rob him or to kill him or to inflict some great bodily harm on the defendant, and that said defendant had reasonable cause to believe there was imminent danger that such design was about to be accomplished, then the defendant had a right to act on appearances, and to shoot said deceased and all who were acting with him to prevent the accomplishment of such design, even though said shot resulted in the death of Michael Finn.

"If you believe from the evidence that the defendant shot the deceased unnecessarily, and when he did not have reasonable cause to believe that the deceased or those acting with him were then about to kill or rob him or do him great bodily harm or personal injury, then there is no self-defense in the case, and you cannot acquit the defendant on that ground.

"6. You are further instructed that the indictment contains the formal statement of the charge, but is not to be taken as any evidence of defendant's guilt.

"The law presumes the defendant to be innocent, and this presumption continues until it has been over-

come by evidence which establishes his guilt to your satis-faction and beyond a reasonable doubt; and the burden of proving his guilt rests with the State.

"If, however, this presumption has been overcome by the evidence and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict.

"If, upon consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground, ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of his innocence."

There was also an instruction on the credibility of witnesses and one concerning the arguments and remarks of counsel and excluded testimony. Certain instructions asked by appellant's counsel were refused. Reference to these will be made. In addition, appellant excepted to the failure to instruct on other matters. Numerous questions are presented for consideration.

I. There should have been an instruction on murder in the second degree. The State's evidence shows that Flynn, in civilian's clothing and with nothing in his dress or on his person to indicate his official character, approached appellant at a relatively **Murder in Second Degree.** dark place on a public street and began to feel about his person. If this was all that happened, it was an assault, so far as the present question is concerned. It is true Flynn says he exhibited his star and announced he was an officer, but this is denied. The jury were to judge whether they believed this testimony. They were not bound to do so. If they did not believe it and did believe the other, first stated, then there was, on the State's evidence, such a showing of provocation that the jury should have been allowed to judge whether the killing was murder in the second degree. [State v. Liolios, 225 S. W. (Mo.) 1 c. 947 et seq., and cases cited; State v. Barrington, 198 Mo. 1. c.

102, 103.] In the instant case from the State's evidence, the jury, as has been pointed out, could have found the circumstances which would justify a verdict of murder in the second degree, as counsel for appellant contend. It will not do to answer that appellant's testimony is that he shot in self-defense and, therefore, no finding of murder in the second degree is possible. The jury had the right to disbelieve this testimony. It seems from the verdict they did disbelieve it.

II. The instruction on flight is assigned as error.

1. The instruction assumes that appellant shot Michael Finn and that in doing so he was guilty of a crime. These were issues in the case. The instruction says: "And if the jury find and believe from

*Assumption of Fact.* the evidence that, after the shooting of Michael Finn, *alleged in the indictment,* the defendant fled from his usual place of abode, for the purpose of avoiding arrest and trial *for said offense,"* etc. The shooting of Michael Finn is "alleged in the indictment" to have been murder in the first degree and to have been done by appellant. If it was not done by appellant, he is not guilty. He has made no judicial admission that he did it. If he did shoot Michael Finn, but did it in self-defense, then there was no *"said offense"* which should have been so characterized by an instruction in this manner. [State v. Mills, 272 Mo. 1. c. 534, 535.]

2. The mere fact that the instruction deals with flight does not make it a comment on the evidence as that word is used in the statute. With respect to a similar question, BLACK, J., said in State v. Witten, 100

*Comment.* Mo. 1. c. 530: "But the refused instruction does not undertake to tell the jury what inference they should draw. They are only told to take the circumstances recited, if true, into consideration in determining the question of the guilt or innocence of the defendant. Such an instruction is in no sense an invasion of the province of the jury. It is the duty of

the judge to aid the jury in coming to a correct conclusion, and there are many cases where it is proper and the due administration of the law demands the giving of such instructions. Thus it is held to be proper to tell the jury that the opinions of expert witnesses are not conclusive, but they are to be considered with other evidence. [Rose v. Spies, 44 Mo. 20.] So the jury may be told that the evidence of defendant's good character may be considered with the other facts in determining the question of his guilt (State v. Underwood, 76 Mo. 635) ; and that flight of one charged with a crime is a circumstance tending to show guilt. [State v. Griffin, 87 Mo. 608.] The refused instruction is no more than a fair cautionary one, and should have been given.". It is not every fact which may be made the subject of such an instruction, but flight is one of them. Of course, to tell the jury that flight raises a presumption of guilt, is a comment for it directly tells the jury the evidence has a designated weight. [State v. Hogan, 252 S. W. 1. c. 389.]

III. The instruction on the right of a police officer to arrest without warrant for any offense, though not committed in his presence, "if he has reasonable grounds to suspect the person arrested is the perpetrator of a crime," is not justified by any evidence in the case. There is not a word which tends to prove any fact, prior to Flynn's accosting appellant, which tended to show any ground for a belief that appellant and Page were committing or had committed any crime or, for that matter, that a crime had been committed by any one. There was, in fact, no evidence of an effort, in the usual sense, to arrest the two and at no time did the officers, prior to the shooting, say to either of them that he was under arrest. This instruction brings into the case a suggestion which the testimony did not warrant and is, at best, an abstraction. It ought not to have been given.

*Arrest on Suspicion.*

IV. The instruction given on self-defense is subjected to criticism. "The court further instructs you that, before you can acquit the defendant upon the ground of self-defense you must believe and find from the evidence that the defendant had reasonable cause to apprehend that the deceased and others acting with him were about to hold him up or to rob him or to do him some great bodily harm and that such danger was imminent and impending, and that it was necessary for defendant to so use his said pistol in the way he did in order to protect himself from said danger, and unless you so believe you will find defendant guilty and assess his punishment as provided in these instructions." This paragraph is complete in itself. Whether a jury would interpret this paragraph to mean that, before they could acquit on the ground of self-defense the danger must have been, in fact, imminent and the shooting must have been, in fact, necessary; or whether they would understand that it was merely needful they should find that, on reasonable grounds, these things must, at the time, have appeared to the appellant to be true, is a doubtful question which a self-defense instruction ought not to introduce into a capital case. There are subsequent paragraphs which tend to clarify this first one, but this seems to be a case in which, at the least, the paragraph asked by appellant should, in substance, have been given, i. e.: "It is not necessary to this defense that the danger should have been real or actual, or that the danger should have been impending and immediately about to fall upon him. If you believe that defendant had reasonable cause to believe these facts and that he shot in self-defense, as herein explained, and to prevent such expected harm, then you must acquit."

This paragraph could have been worded better, but it is substantially like that discussed in State v. Hollingsworth, 156 Mo. l. c. 187 et seq., where this court said:

*Minimizing Self-Defense.*

"The thirteenth instruction given by the court is also assigned as error in this, that it maximizes every restriction of the right of self-defense, and minimizes every right of the defendant. The instruction in these words: 'The court instructs the jury that to justify a killing on the ground of self-defense, it must appear that the party killing was apprehensive in consequence of the acts and conduct of the party killed, that some great bodily injury to himself was impending and about to fall on him, and that such killing was necessary to prevent such injury, either apparent or actual; therefore, if you believe from the evidence that in consequence of the acts and conduct of Schwab, either alone or acting with another at the time the fatal shot was fired, the defendant had reasonable cause to believe and did believe that Schwab was about to kill him or do him some great bodily harm, and that defendant shot to prevent such design being consummated, then your verdict should be for defendant. But you must say from the evidence under all the facts and circumstances before you, whether the defendant did have reasonable cause for such apprehension. If he did not have reasonable cause for such apprehension even though he believed he had, you cannot acquit him on the ground of self-defense.'

"The defendant prayed an instruction substantially like the above, with this modification: 'It is not, however, necessary that the danger should have been actual or real, or that the danger should have been about to fall upon him. All that is necessary is that the defendant should have had reasonable cause to believe that state of facts and did so believe, and shot and killed Schwab to prevent the consummation of such design on the part of Schwab.' The court refused this, and defendant duly excepted.

"The court erred in refusing this qualification of its instruction on self-defense. This has been approved by this court since the case of State v. Starr, 38 Mo. 270. The judgment in State v. Eaton, 75 Mo. 586, was revers-

ed on this identical ground. As said then by this court, 'We do not mean to say that a mere suppositious or conjectural danger—a danger existing only in the imagination of the accused—will excuse or justify a homicide. There must be an apparent danger affording a reasonable ground for apprehension on the part of the slayer, that unless he kill or disable his adversary, his own life or limbs are in imminent peril. Whether the appearances of danger to the accused were such as to afford such reasonable ground of apprehension, is a question for the jury.'

"The defendant is entitled to act upon appearances although it may turn out afterwards that the appearances were false, and there was in fact no design on the part of his adversary to kill or do him great bodily harm or danger that it would be done."

There is another thing in this same paragraph. It requires a finding that appellant, before his acquittal on the ground of self-defense, had "reasonable cause to apprehend that *deceased and* others acting with him were about to," etc. Appellant testified, in substance, that at the time Flynn accosted him and the shooting began, Flynn was the only man on the west side of the street; or, at least, the' only one he saw; that the others were across the street and he did not know so much as whether they watched what was going on. It is clear from the State's evidence that at that time Bobbitt was at least twelve feet away and was making no demonstration; that Fleming and Finn were not near appellant and, if approaching, were but a few feet from the curb on the east side of the street and farther south. There was evidence which would have justified a finding that appellant never saw deceased at all. There was much to the contrary, but this did not justify the disregarding of the other. This part of the instruction clearly denied the right of self-defense unless appellant apprehended danger from *deceased,* and, also, simultaneously, from all

*Deceased and Others Acting With Him.*

State ex rel. Mo. Pac. Ry. Co. v. Cox.

others "acting with him." In the circumstances this was error.

V. The statement made by appellant was admissible and the question whether it was voluntary was one for the jury. Improper matter in it can be excluded    The motion to quash the panel is not in the bill of exceptions. The question concerning the indorsement of the names of additional State's witnesses will be out of the case on another trial, though no error in that respect is made to appear. The diagrams and photographs, upon which chief reliance is placed in the contention that an instruction on accidental killing should have been given, are not in the record. Other questions raised are not likely to recur. If they do, the authorities upon them are clear.

Other Points.

The judgment is reversed and the cause remanded. *Graves, C. J.,* and *David E. Blair, Ragland* and *Woodson, JJ.,* concur; *White, J.,* concurs, except in subdivision 1 of Paragraph II, on which he expresses no opinion; *Walker, J.,* absent.