STATE of Missouri, Plaintiff-Respondent,

v.

Timothy RUTLEDGE, Defendant-Appellant.

No. 36237.

Missouri Court of Appeals, St. Louis District, Division Three.

June 3, 1975.

James Wynne, Charles D. Kitchin, Richard A. Knutson and James C. Jones, Public Defender Bureau, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., and Scott A. Raisher, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty., and Nels C. Moss, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

This is an appeal by the defendant-appellant, Timothy Rutledge, from a judgment entered by the circuit court of the City of St. Louis, sentencing the appellant to twenty years in the Department of Corrections for the offense of robbery in the first degree by means of a dangerous and deadly weapon. §§ 560.120, 560.135, RSMo 1969, V.A.M.S. For reasons hereinafter stated, we affirm the judgment.

Since appellant does not question the sufficiency of the evidence, we will state only those facts necessary for the disposition of the appellant's points on this appeal.

On the morning of April 28, 1973, Mr. Roger Niebruegge, manager, and three other employees, James Sieker, Sue Walker and Sarah Frank, were present in the Steak and Shake restaurant located at 9009 Riverview Boulevard in the City of St. Louis.

At about 7:40 a. m., two men, each holding a gun, entered the restaurant. One of the men was tall (between 6′ and 6′2″) and the other was shorter (about 5′10″). The shorter man, later identified as the appel-

lant, Mr. Rutledge, "stuck a gun" in Niebruegge's ribs and said, "this is a hold-up." Niebruegge turned and saw the man. The man told him to open the safe. Niebruegge went to the safe in the store, "[p]ulled [money] out of the safe, and gave it to him, over my shoulder." The amount taken was $200.00. The shorter person "wore a stocking cap over the top of his head," which covered his ears, but Niebruegge could see his face—nose, eyebrows, eyes and mouth. The shorter person was "[r]ight next to me [Niebruegge.]" At the time the two men were in the Steak and Shake, Niebruegge looked at the shorter man's face "five seconds, or so."

At the time of the entry, James Sieker (referred to in the defendant's brief as "Sieber"), a manager trainee, was seated at a booth and was told to remain seated by the other person who entered the restaurant. As Niebruegge and the shorter person went to the safe, Sieker could see a "side view" of the robber's face, and after the person obtained the money from the safe Sieker was able to see the other side of the shorter man's face.

After taking the money, which was put in Niebruegge's briefcase, Niebruegge was instructed to lie down on the floor. Sarah Frank, an employee who was sitting at the counter, saw the man grab Niebruegge by the arm. She went to the booth where Sieker was and put her head down on the table because she was so scared all "I could do was cry." Sieker attempted to calm her. Sue Walker, the kitchen or "set up lady," was also requested to lie on the floor.

The whole episode took about five minutes. After the men exited, Niebruegge got up, saw the two men pull off the parking lot in a LeMans Pontiac, and Niebruegge jotted down the license number. Sieker got into his car and attempted to follow the car, which he located some distance away on Duenke Road.

Niebruegge called the police and gave a description of the two men. He described the men; he described the shorter man, giving a description of his weight (160–170), his age (mid-twenties), build, race, clothing and complexion. When Sieker returned to the restaurant, he too described the two men—weight, height, age, clothing, etc.

On several occasions after the robbery on April 28, 1973, the police showed Niebruegge and Sieker several photographs to determine if they could identify the men who held up the restaurant. On each occasion, they were shown some two to six photos. Finally, on May 29, 1973, Officer Robert Priest came to the restaurant with some photographs, and both Niebruegge and Sieker separately identified the defendant as the shorter of the two who entered the restaurant and took the money. Niebruegge first looked at the photos, which were black and white with no identifying marks relating to names, heights, weights or ages. He identified defendant independently of Sieker. The photograph identified as the defendant by both Niebruegge and Sieker showed no mustache worn by the defendant. Sieker was not present when Niebruegge identified defendant from the photo, but was "working on the line, up front . . . ." Sieker also viewed the photographs outside the presence of Niebruegge and recognized one of the photos as the shorter of the two men who entered the restaurant. He was "certain that [he] was the shorter of the two robbers." There was no discussion between the officer and the two victims.

Nothing then occurred until August 20, 1973. On that date, Officers Fred Armes and his partner Ronald Roach, together with an F.B.I. agent, saw Rutledge in his El Dorado Cadillac "[c]oming out of a driveway in the 10000 block of Belfontaine Road." "We recognized the car and the driver, and we immediately pulled out of the driveway behind him, and he accelerated at a high rate of speed north." When the car accelerated, the officers activated the siren. Rutledge's car went on to I–270 and attained speeds of 90 to 95 m. p. h. and

speeded east toward Illinois. As it approached the bridge, the Cadillac crossed the median, made a U-turn and headed west. The officers did the same. As they were making a turn, the officers fired a shot. Rutledge swerved down the highway for "possibly a hundred yards and pulled over and stopped." In the Cadillac was Rutledge, his wife and their six-month-old baby.

Rutledge was taken into custody and conveyed to headquarters where a lineup was held with three other men. Niebruegge and Sieker, independently, viewed the lineup and recognized Rutledge as the shorter of the two men who came into the restaurant on April 28, 1973. At the lineup, Rutledge had a mustache. On the day of the robbery, Niebruegge testified that he did not have a mustache, but at trial Niebruegge was "certain" that Rutledge was the shorter of the two on that April day. At trial Niebruegge was "certain that he was one of the robbers."

Niebruegge viewed the lineup first outside of the presence of Sieker, and then Sieker viewed it. Niebruegge recognized the shorter of the two men who had come in the restaurant as one of the holdup men, although at the lineup he had a mustache. Sieker viewed the lineup and recognized just one person as one of the "robbers that robbed us that morning"—"[t]he shorter one." There was no communication between Niebruegge and Sieker between the viewings, and the officers conducting the lineup—Armes and Roach—never indicated whom they should identify.

Eventually, appellant was charged with a prior conviction and with the robbery which occurred on April 28, 1973. Trial began on February 28, 1974. At trial, Niebruegge identified Rutledge as one of the men who entered the restaurant and took the money. He was "positive and certain." Sieker also was "positive and certain" that Rutledge was one of the individuals who took the money on April 28, although on that date he had no mustache.

The defendant's defense consisted of testimony of his wife, Diane Nelson, who was also known as Diane Rutledge, Diane's brother-in-law, Terry Mitchell, Diane's mother and a neighbor, Tony Carr.

Diane testified that on April 28, Rutledge awoke early in the morning and went fishing with Terry Mitchell in Festus. Diane also testified that she was in the car on I–270 on August 20, 1973, when it was speeding 90 to 95 m. p. h. but didn't hear a siren and didn't know why they were speeding, although she and the baby were on the floor. Terry Mitchell also stated that he and Rutledge went fishing and stayed until about midday. The thrust of the testimony of all these witnesses was that Rutledge had always worn a mustache from about November or December, 1972, and had a mustache in April 1973. Photographs of Rutledge taken during this period showing him with a mustache were introduced.

The State, in rebuttal, introduced the testimony of Officer William Miller. He testified that one week prior to the robbery, he saw Rutledge run a stop sign and gave him a traffic ticket. At this time, he said, Rutledge did not have a mustache.

■ Prior to rebuttal testimony, evidence was taken on the appellant's two pretrial motions to suppress identification. Appellant moved to suppress (1) "any identification testimony by the State's witnesses on the grounds that it would rest on a pre-trial confrontation which was unnecessarily suggestive and conducive to an irreparable mistaken identification," and (2) the in-court identification, because the lineup "did not contain a sufficient number of similarly appearing individuals so that by reason of physical characteristics the defendant was chosen by reason of his individuality rather that [sic] the knowledge of the witnesses as to appearance of the suspect," and by reason of the lineup, "the witness or witnesses who will identify the defendant in Court will base their identification on their memory of the identity of the defendant at the

lineup rather than their memory of the identity of the individual who committed the offense." At the evidentiary hearing on the motions, Rutledge testified he was not advised of his rights to be in a lineup or to have an attorney present and he requested an attorney.[1] No facts were presented as to how the confrontation was unduly suggestive.

The court gave a number of instructions including a circumstantial evidence instruction and a "flight" instruction.[2]

During the first half of the closing argument of the prosecutor, the prosecutor referred to the photographic identification. He said, "Then, a month later both of these individuals [Niebruegge and Sieker] without any suggestion on the part of Sgt. Priest, identified this same man out of a set of mug shots they had been shown. . . ." No objection was made.

In the closing half of the argument, the prosecutor stated, "The question here is, are these people who testified before you, positive? Are they certain? Did they have the means at hand to view this man and later identify him. They looked at *mug shots* . . . ." (Emphasis added). Defense counsel objected and said, "Your Honor." The prosecutor then immediately said, "Excuse me. They looked at *photographs*." (Emphasis added). The court sustained the objection, the jury was instructed to disregard the reference, but the court denied counsel's motion for mistrial. The prosecutor made one further reference to "mug shots—pardon me, out of the photos." Again, counsel objected, which was sus-

tained; the jury was instructed to disregard it, but a motion for mistrial was denied.

During the closing argument, the prosecutor also argued:

"When he's finally arrested, he has his wife lie on the floor of the car, while he is chased down the highway, runs down the highway in a car; a Cadillac, El Dorado, doing 90 to 95 miles an hour. Sure, he has great concern for his wife, Diane, Diane Nelson and his child when he is doing that. He wants you to have greater concern for him and his wife now. He is a man who looks like a man, he walks like a man, he talks like a man. He is old enough. He's been around long enough to know—"

The jury found the defendant guilty. The court, after overruling a motion for new trial and granting allocution, sentenced the defendant to twenty years. Defendant was granted leave to appeal as a poor person.

On this appeal, appellant contends that the court erred in (1) "overruling the defendant's pretrial motion to suppress the in-court identification testimony of Mr. Niebruegge and of Mr. Sieber [sic], because that identification rested on pre-trial confrontations which were unnecessarily suggestive and conducive to irreparable mistaken identification"; (2) "overruling defendant's motions for a mistrial and objections to the prosecuting attorney's closing argument because [it] was highly prejudicial, inflammatory, and conveyed to the

1. There is no constitutional right to counsel at a pre-indictment lineup or showup, Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), or at a photographic display conducted to allow witnesses to identify the offender. United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

2. INSTRUCTION NO. 8: " 'The Court instructs the jury that while flight to avoid arrest of itself does not establish the question of guilt or innocence, yet if you find and believe beyond a reasonable coubt [sic],

from all the evidence, that the defendant, when St. Louis Police Officers sought to take him into custody on this charge on August 20, 1973 for the alleged charge of robbery first degree by means of a deadly and dangerous weapon for which he is now on trial, attempted to flee from them with an intent to avoid prosecution and arrest for the alleged offense for which he is now on trial, then such attempted escape is a circumstance which may be taken into consideration by you, with all other facts and circumstances in the case, in determining the defendant's guilt or innocence.' "

jury that defendant had a prior criminal record"; and (3) in giving the "flight" instruction because it constituted an improper comment and because the instruction is not authorized by MAI–CR.

As to the first point, while recognizing that both "Mr. Niebruegge and Mr. Sieber [sic] *separately* viewed the line-up [emphasis added]," appellant argues only that because of the "photographic identification procedure and the line-up confrontation, both witnesses based their in-Court identification on their memory of the identity of the defendant in the photograph and at the line-up, rather than their memory of the identity of the individual who committed the offense." He relies on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ He does not, however, favor us with *facts* as to how, and in what way the photographic and lineup procedure was impermissible or conducive to irreparable mistaken identification, other than the in-court identifications are based on memory of the photograph and lineup procedures.[3] But appellant contends that the identification procedures—photographic and lineup—were impermissible and caused a misidentification.[4] We garner from his contentions that each of the persons, other than defendant, wore a narrow wrist-band on his wrist, and the fact that defendant had a mustache made the lineup suggestive.

**3.** It is incumbent on the movant to state facts of such specific nature so as to enable the court to conclude that a serious claim was presented. "[M]otions must state facts, not conclusions." State v. Jordan, 506 S.W.2d 74, 80 (Mo.App.1974), citing State v. Parker, 413 S.W.2d 489, 494 (Mo. banc 1967), cert. den. 390 U.S. 906, 88 S.Ct. 823, 19 L.Ed.2d 874 (1968).

**4.** Appellant's argument seems to be that an in-court identification after a photographic or lineup identification is impermissible.

## I

The principles relating to due process protection against the admission of evidence derived from allegedly suggestive identification procedures are now well-settled and have been explicitly set forth by the United States Supreme Court and by the highest court of this state.

■ In Stovall v. Denno, supra, the Supreme Court held that the defendant could claim that the "confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." 388 U.S. at 301–302, 87 S.Ct. at 1972. Whether the identification procedures are so unnecessarily suggestive is to be determined from the "totality of the circumstances." *Stovall*, supra; Simmons v. United States, supra. In *Simmons*, the Court stated that:

"[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972–1973, 18 L.Ed.2d 1199, and with decisions of other courts on the question of identification by photograph." 390 U.S. at 384, 88 S.Ct. at 971.[5]

The United States Supreme Court, while recognizing the hazards, was unwilling to prohibit such practices either in the exercise of its supervisory power or as a matter of constitutional requirement. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

**5.** Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), is perhaps the only Supreme Court decision in which due process has been held to be violated. See Neil v. Biggers, supra.

As stated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), certain guidelines emerge from the cases. The primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Simmons*, supra, 390 U.S. at 384, 88 S.Ct. at 971. "It is the likelihood of misidentification which violates a defendant's rights to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification." The central question is:

> "[W]hether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. . . . [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. at 198, 199, 93 S.Ct. at 382.

In Neil v. Biggers, there was a lapse of seven months, but the Court held that in view of the reliability of the identification the identification was not impermissible.

■ In Missouri, the *Stovall-Simmons* test to determine whether identification procedures are impermissibly suggestive is stated in numerous decisions. State v. Tidwell, 500 S.W.2d 329, 331 (Mo.App.1973); State v. Cole, 519 S.W.2d 370, 372 (Mo.App. 1975); State v. Parker, 458 S.W.2d 241, 244 (Mo.1970), and State v. Ealey, 515 S.W.2d 778, 779–780 (Mo.App.1974). Whether due process is violated is to be evaluated in the

light of the totality of the circumstances. State v. Boothe, 485 S.W.2d 11, 13 (Mo. banc 1972). Each case must be considered on its own facts, but consideration should be given to (1) the presence of an independent basis of identification, (2) the absence of any suggestive influence by others and (3) a positive courtroom identification. See also State v. McIntosh, 492 S.W.2d 843, 846 (Mo.1973),[6] and State v. Gay, 523 S.W.2d 138 (Mo.App., St.L.D., 1975).

■ Furthermore, it is no longer open to argument in this state that even though the photograph or lineup identification is tainted or in some way suggestive, where there is an untainted positive in-court identification made upon a factual basis independent from such photographic or lineup procedures, such in-court identification is proper. State v. Ealey, supra, 515 S.W.2d at 780; State v. Ealey, supra, 519 S.W.2d at 320.

■ Tested by all these legal principles, we are convinced that under the facts of this case the identification procedures as to both the identification of the defendant from the photographs and the lineup were not impermissibly suggestive so as to give rise to a substantial likelihood of misidentification. As to the photographs, Officer Priest, who displayed the photographs to Niebruegge and Sieker, in no way channeled their thinking or made any suggestions. Officer Priest, on May 29, merely stated that he had some photographs to show them. There were no identifying marks on the photos. Each witness viewed the photographs independently. No communications occurred between them. Each identified the defendant as the shorter of the two men who entered the restaurant on April 28, 1973.

**6.** The following facts do not necessarily constitute a valid challenge to the propriety of a lineup: one participant has growth of hair on chin—State v. Tidwell, supra; assailant is bald but another in lineup has full head of hair—State v. Ealey, supra, 515 S.W.2d at 780, State v. Ealey, 519 S.W.2d 314, 319 (Mo.App.1975); one in lineup is older and wearing hat and coat—State v. Britt, 504 S.W.2d 38, 41–42 (Mo.1973); appellant is only one in lineup with a "weather-beaten face"—State v. Tomizoli, 519 S.W.2d 713, 715 (Mo.App.1975). For a complete discussion of allegedly suggestive procedures, see Annot., 39 A.L.R.3d 487, 791 and 1000 (1971).

As to the lineup, there was no impermissibility. After the chase and at the lineup, each victim viewed the lineup separately. Each identified the defendant. The police officers conducting the lineup made no suggestions to either witness. The other three men in the lineup from the photograph we viewed appear similar in size, build, age and race.

The fact that each of the three men had on a wrist-band is not decisive. When questioned on this point, Sieker stated that he did not notice them. None of the officers influenced the witnesses as to who should be picked out. Sieker picked out the defendant "because he was the robber."

In fact, the lineup seemed to be weighted in favor of the defendant, since the two eyewitnesses stated that the shorter person had no mustache at the time of the incident in April, but appellant was the only participant in the lineup with a mustache.[7]

Furthermore, because of the presence of an independent basis of identification, we are convinced that the in-court identifications by Niebruegge and Sieker were properly permitted and the court did not err in denying the defendant's motion to suppress identification. State v. Cole, supra; State v. Mentor, 433 S.W.2d 816, 820 (Mo.1968); State v. Hampton, 509 S.W.2d 139, 141 (Mo.App.1974); State v. Taylor, 456 S.W.2d 9, 10 (Mo.1970).[8]

Niebruegge could see the shorter person's face; he saw the person well enough to give a description. The stocking cap did not cover the shorter person's face but just his ears. Sieker also observed both sides of the face.

In short, where the witnesses saw the assailant during the course of the robbery, where they gave a reasonable description of him to the police, where they each were able to select the defendant's picture from a collection of photographs, and where they each, without suggestions from officers, identified defendant in the lineup, there was an ample basis for the in-court identification of the defendant having a source independent of any allegedly tainted identification procedures. State v. Taylor, supra; State v. Cole, supra.

Based on the law and the record in this case, we are convinced the trial court did not err in overruling the defendant's pretrial motions to suppress the identification.

## II

As to the appellant's second point, the appellant contends that the prosecutor's argument concerned "prior convictions" apparently because the prosecutor used the term "mug shots" and that the defendant had "been around long enough to know . . . ." He contends that these comments were "highly prejudicial and conveyed to the jury that defendant had a prior criminal record." He also contends that the reference to the defendant and his wife traveling in the automobile at high speed arouses a personal "hostility toward or personal fear of the defendant."

He therefore contends that the trial court should have sustained his motion for a mistrial.

The declaration of a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudicial effect of the incident is so grievous that it can be removed in no other way. State v. Heather, 498 S.W.2d 300, 303 (Mo. App.1973). Whether remarks of counsel re-

---

7. Cf. State v. Britt, supra, 504 S.W.2d at 41–42, where the defendant appeared in the lineup with coat and hat and all the testimony indicated that robbers did not have on such clothing.

8. The victim looked at his assailant during the robbery; the victim gave a reasonable description and was able to select the defendant's picture from a collection without suggestions from the officers. There was ample basis for an in-court identification having a source independent of any alleged lineup.

quire a mistrial and the discharge of the jury rests largely in the discretion of the trial court which is in a much better position than the appellate court to evaluate the prejudicial effect and the possibility of its removal by action short of mistrial.

 While we do not condone the two references to "mug shots," we cannot say that the trial court erred in denying the motion for mistrial. The jury was instructed to disregard the references, and in the context, the prosecutor quickly corrected himself. On each of two occasions, the prosecutor corrected himself, even prior to the court's ruling. He made no reference to a prior arrest. A closing argument need not have the polish and exactness of a scholarly address. Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

Furthermore, we are not convinced that a reference to "mug shots" indicates the commission of separate crimes. Cf. State v. White, 495 S.W.2d 448, 449–450 (Mo.App. 1973); Annot., 30 A.L.R.3d 908 (1970). The context in which the term was used was in the identification from photographs and not that the defendant had committed other offenses.

The remarks concerning that "he's been around long enough to know" are not a reference to a prior criminal record. Merely because a person has been around does not connote a prior criminal record.

 Appellant argues that the statements of the prosecutor which indicate he had little concern for his wife and baby showed hostility toward him. We disagree. The trial court has wide discretion in determining the latitude in permitting argument of counsel, and we will not reverse unless

there has been an abuse of discretion. As long as the prosecutor stays within the record and its reasonable inferences, his argument is legitimate. State v. Taylor, 508 S.W.2d 506, 514 (Mo.App.1974). The remarks were within the record and showed no personal hostility toward defendant such as is found in other decisions.[9] These remarks certainly do not rise to the level of remarks in State v. Heinrich, 492 S.W.2d 109 (Mo.App.1973), relied upon by the appellant. The comments regarding defendant's "concern" for his wife were an inference deducible from the facts in evidence.

Lastly, appellant complains that the court erred in giving the "flight" instruction. We disagree.

Defendant argues that since the flight was not from the scene of the crime and did not occur "promptly" after commission of the offense, a flight instruction was not warranted. Defendant's flight from pursuing police officers occurred almost four months after the robbery and began in an area other than that of the robbery scene.

 Unexplained flight is a relevant circumstance in connection with guilt or innocence. Flight may be either from the scene of the crime or elsewhere if it is in order to avoid arrest or prosecution. Remoteness of the flight—in space and time—from the scene and time of the alleged crime goes only to the weight of the evidence and not to its admissibility. State v. Coleman, 441 S.W.2d 46, 53 (Mo.1969). In State v. Ball, 339 S.W.2d 783, 91 A.L.R.2d 1042 (Mo. banc 1960)[10] our Supreme Court held that unexplained flight, even thirty days after the supposed commission of a crime, is a relevant circumstance to be considered.

9. See cases summarized in State v. Jackson, 499 S.W.2d 467, 471 (Mo.1973).

10. A flight instruction relating to a defendant's fleeing "from his usual place of abode" was upheld in a case wherein defendant, upon hearing that a grand jury would be convened two days hence, left Columbia,

Missouri, for Chicago, where he remained five or six months before returning. State v. Kelley, 187 Mo.App. 163, 173 S.W. 22 (1915). Apparently, "usual place of abode" is construed to include a town or city. Note that in the case at bar, appellant, a St. Louis resident, was speeding toward an Illinois bridge as he was pursued by police.

Furthermore, our Supreme Court has long held that a flight instruction is proper and is not a comment on the evidence. State v. Griffin, 87 Mo. 608, 613 (1885); State v. Jordan, 306 Mo. 3, 268 S.W. 64, 70 (banc 1924); State v. Meininger, 306 Mo. 675, 268 S.W. 71, 76–77 (1925); State v. Bryant, 361 Mo. 318, 234 S.W.2d 584, 586 (1950); State v. Coleman, supra, 441 S.W.2d at 53. See State v. Hudson, 491 S.W.2d 1, 3 (Mo.App.1973). We believe there was sufficient evidence to warrant giving a flight instruction. Appellant relies on State v. Aubuchon, 394 S.W.2d 327 (Mo.1965), but in that case the instruction was permitted.

Defendant raises the additional objection to the instruction that flight is one form of circumstantial evidence and the State should be precluded from submitting instructions on both circumstantial evidence and on flight.[11]

The court gave a circumstantial evidence instruction (MAI–CR 3.42 verbatim) in addition to the above-quoted flight instruction. However, the Notes on Use of MAI–CR 3.42 do not explicitly exclude the giving of a flight instruction.

Although our Supreme Court on January 13, 1975, directed that after March 1, 1975, no "so-called flight or counter-flight instruction may be given," the court's explanatory note on flight is not retroactive. State v. Fleming, 523 S.W.2d 849 (Mo.App., St.L.D., 1975).[12] We do not believe the Supreme Court, by adopting some instructions, intended to abolish others until it specifically so provided. Rule 20.01 alerts us to the fact that "[a]pproval of pattern instructions to juries . . . will be made from time to time by order of this Court." The MAI–CR is not yet complete. Until new applicable instructions are adopted or explicitly are disapproved, other instructions which correctly state the law but are not contained in MAI–CR still obtain.

The MAI–CR Comment on the section labeled "Instructions Never Given" (which was left blank in the originally promulgated MAI–CR) reinforces our belief that flight instructions were not banned retroactively, since

"[s]ome of these [instructions] will be gathered together in the 5.00 Series, there to be quarantined and barred from *further* use." MAI–CR Comments at 13 [emphasis added].

At the time of trial, the instruction on flight was a proper one. We decline to adopt the appellant's contention that the flight instruction should be eliminated from Missouri practice prior to March 1, 1975.

We have read the entire record, the briefs and all the authorities cited by the parties. We are convinced that no prejudicial error occurred and hence affirm the judgment of conviction.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.

11. This specific ground was not set forth in defendant's motion for new trial. Rules 70.-02, 28.01, 27.20(a). Therefore, we review defendant's claim only insofar as it may constitute plain error. Rule 27.20(c).

12. Defendant's trial began on February 28, 1974.