STATE of Missouri, Respondent,

v.

Billy Ray WALTERS, Appellant.

No. 54975.

Supreme Court of Missouri, Division No. 2.

Sept. 14, 1970.

As Modified on Court's Own Motion Sept. 30, 1970.

John C. Danforth, Atty. Gen., Thomas L. Patten, Asst. Atty. Gen., Jefferson City, for respondent.

Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; Willard B. Bunch, Chief Defender, Paul T. Miller, Executive Director, Kansas City, of counsel.

PRITCHARD, Commissioner.

Appellant's guilt of the offense of assault with intent to rape was found by a jury which assessed his punishment at five years imprisonment in the Department of Corrections.

By his second point on this appeal appellant asserts that he was denied his constitutional right to counsel at a pre-trial lineup under the Sixth Amendment to the Constitution of the United States. His Fourteenth Amendment rights are also claimed to have been violated. The facts show that appellant did not have counsel at the lineup, but also that he had not been indicted and no information had been filed against him at that time. A number of other state jurisdictions have expressly held

that the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, apply only to post-indictment situations. People v. Palmer, 41 Ill.2d 571, 244 N.E.2d 173, 175 [2, 3]; People v. Cesarz, 44 Ill.2d 180, 255 N.E.2d 1, 4 [2–5]; People v. Green, 118 Ill.App.2d 36, 254 N.E.2d 663, 665 [5]; State v. Thomas, 107 N.J.Super. 128, 257 A.2d 377, 380; State v. Fields, 104 Ariz. 486, 455 P.2d 964, 965 [1]. See also Commonwealth v. Bumpus, 354 Mass. 494, 238 N.E.2d 343. In the concurring opinion of Hayes v. State, 46 Wis.2d 93, 175 N.W.2d 625, 633, after noting that the rationale of the Wade and Gilbert cases was that a *post-indictment* lineup was a critical stage of the proceedings, it was said, "At earlier stages the practical difficulties of appointing or arranging for the presence of counsel appears formidable. Thus the limiting of the *Wade-Gilbert* rule to post-indictment situations has sound reasons to recommend it. Regardless of the reasons, the limitation is stated in the rule. If the rule is to be extended to earlier stages or other situations, the court that authorized the rule should do the extending." For a court holding contrary to the foregoing cases see People v. Fowler, 1 Cal.3d 335, 82 Cal. Rptr. 363, 461 P.2d 643, 650. For the reason that appellant's lineup identification preceded the filing of the information against him, the Gilbert rule does not apply, and Point II is overruled.

■ In Point I appellant contends that his lineup confrontation by the alleged victim was so suggestive and conducive to mistaken identity as to deny him due process of law, and the court erred in denying his motion to suppress the in-court identification. The evaluation of this point requires that the "totality of the circumstances" be examined. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

The trial court held a pre-trial hearing on the issue of suggestiveness of the lineup identification as presented by appellant's motion. The facts there developed are: On November 23, 1968, Miss Dorothy Dunn drove into the parking lot of Trinity Lutheran Hospital in Kansas City to go to her employment there. It was in the early morning hours, and prior to entering the parking lot she saw a man at 30th and Baltimore. She thought he had gone on, but when she got out of her car she saw him standing there. The parking lot was lighted and there was a little area by the hospital building through which one could walk from the back parking lot to the front one. The little area was not very dark. The time was about 5:20, early in the morning, and the day had not started coming in. The man asked Miss Dunn if she worked there, and she said "Yes" and asked him what he was doing there. He said he was sick, he had a stomach ache. She walked on, not realizing he was going to bother her, when he grasped her by the neck and choked her. She was "screaming and hollering" and on the ground wrestling with him, and finally got his hands from around her throat. Then he held her around her neck, "just like you'd hug somebody," and had her walk back to her car, telling her not to call out. There was some brush by her car and the man pulled her down on the rocks there, got on top of her, pulled down her clothes and told her to open her legs. She told him she could not, and he had her get her girdle down. Then he looked up and saw a guard. It took about two to three minutes for her to get from the place where she was accosted to the rocks. The man saw someone and jumped up and ran down the hill, with another man trying to catch him. The whole occurrence took about twenty minutes. A passing policeman was summoned, and at the scene Miss Dunn gave him and another officer a description of the person who assaulted her as being about five feet nine or ten inches tall and about twenty-five years of age. She was then taken down town, about six o'clock, to police headquarters and there looked at some photographs, according to her a hundred or more. She looked through practically all of the photographs. After having gone through a first stack,

she was given another stack of photographs in which she found one which she recognized as her assailant.

In December, 1968, Miss Dunn viewed four persons in a lineup. One person was about five feet ten or eleven, "a young guy" with a "kind of brown skin, not dark." He was dressed "fair" and was not dirty. The second man, a Billy Busby, was shorter and was known to Miss Dunn. He had a medium brown skin, and was dressed casually. The third man was nineteen or twenty years of age and looked "real young," being about five feet ten or eleven. The fourth man was Billy Ray Walters, who was about five feet nine or ten, weighing about 165 or 170 pounds. He had on yellow boot shoes, old jeans, and a dirty tan imitation leather jacket. Prior to the time Miss Dunn went to the police lineup a detective called her and told her they had the man she had identified, but she did not think they told her his name until after she got there.

At the lineup the subjects came out and gave their names. An officer had them turn around to different sides, side profiles, this taking ten to fifteen minutes. Miss Dunn was sitting in the showup room to the side and in the back. Detective Theisen was standing, and after the lineup he came and asked Miss Dunn "if that was the guy." "A. He said, 'Is that the one?', and I said, 'Yes.' He said, 'You've got to tell me definitely,' and I said, 'Yes, that's him' because at first I was so afraid I told him 'I think it is,' and he said, 'No, you've got to tell me,' and I said, 'It's him. I remember him.' * * * He asked me if the guy was the one that they showed me out of all the guys, and I picked him, you know. Q. You said what? A. I told him he was the one, that's the one I picked out. Q. The detective said, 'You've got to tell me definitely.' A. Yes. Q. Weren't you definite when you told him? A. Sure I was definite."

Detective Thomas Theisen testified on the pre-trial hearing that he conducted the lineup on December 13, 1968, with four people being placed therein. Appellant was the fourth colored male from the left. He denied that in the course of his conversation either immediately after the crime or during the course of the showup he suggested an identification to the complaining witness.

At the trial Miss Dunn testified that there were about three or four light poles in the Baltimore parking lot, which lit up the passageway to the front parking lot. The passageway itself had no light bulbs. The parking lot lights lit up the place so she could see where she was going. The man who attacked her was a Negro and there was something about his face that she remembered, and she did have an opportunity then to see him. As Miss Dunn was looking through the pictures at the police station she was looking for facial features and when she came across the picture she thought was the person who attacked her she stopped there and told the police "that was the one." At the lineup she recognized her assailant when he walked on the stage. She pointed out appellant in the courtroom as being the man she recognized in the lineup. On cross-examination, Miss Dunn described the parking lot where she was attacked as being about a half block square. There were three or four big lights, on poles, like street lights in the lot. The passageway between the Baltimore and Wyandotte parking lot is wide enough for cars to come through it and it is paved. There is no light in there, but one can see from the other lights. She looked at about a hundred pictures at the police station, in two stacks or piles. She recognized the photograph of Billy Ray Walters, and quit looking at them then because she was "dead certain." She denied that the officer who called her to come to the lineup gave her the name of Billy Ray Walters as being in custody, and if she testified to that earlier, "I must have been nervous." Appellant states in his brief that Miss Dunn testified that she was called at work by a police officer who told her that the name of the man she had identified from the photograph was Billy Ray Walters. However, the transcript in that respect shows

this: "Q. Did they tell you at the time you picked out the photograph that it was Billy Ray Walters that you had identified? A. You mean the first time I went? Q. Yes. A. I don't know if they told me the first time or not. I think they didn't tell me until the second time. Q. When did they tell you the second time? A. When they called me to work on Friday morning. Q. They said what? 'We've got Billy Ray Walters.' A. They said they had the guy that I had identified, this detective, when he called me, but I don't think he told me until after I got there what the name was." Miss Dunn talked to the officers only after she had made the identification in the lineup, when one officer asked her "which one was it," and she pointed out the man and told him definitely he was the one. In the preliminary hearing she again saw appellant and "knew it was him again." She concluded her testimony on cross-examination thus: "Q. And you are in here today telling this jury that you are absolutely positively sure that this Billy Ray Walters—A. I am. Q. Let me finish—is the same man that assaulted you? A. Yes. Q. That's right? A. Yes. Q. No question in your mind? A. No." On redirect examination Miss Dunn testified that she recognized appellant at the sight of him in the lineup and before he had said a word, and before she knew what his name was, and "Q. Now, did you pick this man out because he was dirty and the others were clean? A. No, there was something about his face that I remembered. * * * Q. (By Mr. Pelofsky) What characteristics did you rely upon to identify one person on that lineup? A. You mean this person, this Billy? Q. Yes. A. You mean what I recognized about him? Q. Yes. A. It was his eyes and his hair was kind of standing, and there was something about his eyes that I remembered." Appellant, in the lineup, was dirty, but that had nothing to do with the fact that Miss Dunn picked him out of the lineup.

Detective Thomas Theisen testified at trial that he talked with Miss Dunn as to the alleged offense on the morning it happened and directed her to police "mug files" containing numerous police photographs. She picked out a picture of appellant and Theisen issued a pickup for him. He instructed Miss Dunn as to the lineup procedure: How people would be in the lineup, to look at them, listen to names and "try to identify them by voice and facial features." She was to tell him which persons, if any, were suspects as they appeared from the left. He recalled that appellant was unkempt when he appeared in the lineup, and denied that he told Miss Dunn that appellant (by name) was going to be in the lineup. If Miss Dunn testified to that she would have been mistaken. But he did tell her that the man she had identified (apparently from the photograph) would be in the lineup.

■ The evidence shows that the events which took place in the hospital parking lot took place in about twenty minutes. Miss Dunn testified that while it was still dark there were lights in the parking lot where she was accosted, which lights also lit the passageway which went from the back lot to the one in front. Although Miss Dunn did not directly testify that she recognized appellant in the hospital parking lot while he was there with her, the further events establish that recognition beyond the standard of reasonable doubt required for a conviction. Within an hour Miss Dunn went to the police station and there went through many photographs—at least sixty or seventy. The circumstances of the photograph identification do not offend the caveat stated in Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247, 1253, "This danger [of incorrect identification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other

evidence that one of the persons pictured committed the crime." The Simmons case went on to hold that the employment of photographic identification procedures would not be prohibited, but that each case must be considered on its own facts, "and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (88 S.Ct. 971, 19 L.Ed.2d 1253.) Here, Miss Dunn not only went through the large number of photographs, but there was no suggestion whatever from police officers that any one or more of them were suspects. Her testimony is that when she came across appellant's photograph she was "dead certain" that he was the one who assaulted her a short time before. Detective Theisen's testimony that Miss Dunn "tentatively" identified appellant from the photograph is his version of what then occurred, not hers. It follows as a strong inference that Miss Dunn's definite identification of appellant's photograph within an hour of the incident was directly derived from her observance of him during the twenty-minute contact in a parking lot sufficiently lighted for her to see his facial features.

About a month later, Miss Dunn was called by Detective Theisen and advised that the man she had identified by photograph would appear in a lineup. The name of the man was not revealed to her prior to her seeing him in the lineup. She recognized him immediately upon his appearance as the fourth man in the lineup and before he spoke and gave his name. There was nothing suggestive as to the identification on the part of Detective Theisen, who after the lineup asked Miss Dunn merely "Is that the one?", and insisted that she tell him definitely. The facts of this case do not come within Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402, as to appellant's contentions of a suggestive lineup procedure. Here, Detective Theisen

merely pressed Miss Dunn for a definite identification of appellant in the lineup. In the Foster case petitioner stood out in the lineup by reason of height and dress similar to that worn by the robber. At this time the witness could not positively identify petitioner as the robber, a one-to-one confrontation was permitted, and later a second lineup was conducted in which petitioner was the only person who had also participated in the first lineup. Additionally, the police repeatedly said to the witness, " 'This is the man.' " It was said, "This procedure so undermined the reliability of the eyewitness identification as to violate due process." (89 S.Ct. 1129, 22 L.Ed.2d 407 [4].) Nor do the facts here accord with the highly suggestive atmosphere present in the case of Palmer v. Peyton (C.A. 4th), 359 F.2d 199.

At the trial, as above noted, Miss Dunn was positive as to appellant being the man who assaulted her. She was subjected to vigorous cross-examination as to the facts surrounding her identification at the scene, at the photograph examinations, and at the lineup, and she remained steadfast in her identification on the three occasions. It was thus brought out to the jury any potential for error in the procedures used. Simmons v. United States, supra. In the footnote of Foster v. California, supra, it is said (89 S.Ct. 1128, 22 L.Ed.2d 406): "The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. But it is the teaching of Wade, Gilbert, and Stovall, supra, that in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible." Fairly construed, the lineup procedure here was not defective by reason of any suggestions made by Detective Theisen. It is also clear that the in-court identification made by Miss Dunn had a source independent of the lineup identification: her observance at the scene of appellant, and immediately following that a proper photographic identification of him. Thus the

findings of the trial court in this respect are not clearly erroneous.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

MORGAN and FINCH, JJ., concur; DONNELLY, P. J., concurs in result.

As Modified on Court's Own Motion

PER CURIAM:

It appearing from the records that the verdict of the jury assessed appellant's punishment at five years imprisonment, but the trial court reduced the punishment to four years imprisonment in the Department of Corrections, the opinion herein is modified to show the proper sentence imposed: Four years imprisonment in the Department of Corrections.