### STATE of Missouri, Respondent,

### v.

### William Gene MERRITT, Appellant.

### No. 54985.

Supreme Court of Missouri,
Division No. 2.

Dec. 14, 1970.

John C. Danforth, Atty. Gen., Thomas H. Stahl, Asst. Atty. Gen., Jefferson City, for respondent.

Robert E. Douglass, Errol D. Taylor, St. Joseph, for appellant.

BARRETT, Commissioner.

A jury found William Gene Merritt "guilty of assault with intent to kill, with malice aforethought" and since he had prior felony convictions the court fixed his punishment at forty-five years' imprisonment.

Upon this appeal Merritt has been represented by two vigilant, diligent lawyers and they have briefed and argued several claims of error including a charge that the evidence is insufficient to sustain the alleged charge and verdict. In addition the appellant has filed a pro se brief of thirty-five points citing four hundred sixty-four (464) cases, statutes and constitutional provisions. The appellant is a prolific prison writ writer and even since the submission of this cause and unknown to his

lawyers has lodged a communication in this court in which he asserts that his appeal involves and presents forty-five (45) errors. Many of his arguments have no relevance to the record, his so-called legal points are misplaced and display a woeful lack of knowledge, particularly of the law. Needless to say, the appellant's briefs and communications have been less than helpful to an orderly and dispassionate disposition of his cause. As a matter of fact had it not been for his insistence in directing the conduct of his trial, contrary to and regardless of his trial counsel's advice, it is doubtful that the state in its own proof made a case under Sec. 559.180: "Every person who shall, on purpose and of malice aforethought, shoot at or stab another, or assault or beat another with a deadly weapon, or by any other means or force likely to produce death or great bodily harm, with intent to kill, maim, ravish or rob such person * * * shall be punished by imprisonment in the penitentiary not less than two years." Compare the less serious assault and its graded punishment of RSMo 1969, Sec. 559.190, V.A.M.S.

In brief the charge and conviction arose in these circumstances: On February 1, 1969, (the second was Sunday and the assault was sometime after midnight and so, of course, was alleged to have been committed on that date) Alvin Garrison, his cousin Ronald Pool and Leonard Mathias, all from Fairfield, Iowa, spent Saturday evening in the New Orleans Lounge on Sixth Street in St. Joseph. At or about closing time, the police were called and arrived at 1:20 a. m., the saloon patrons, twenty to thirty in number, congregated in front of the New Orleans Club to watch two girls pulling hair and fighting. The operator of the lounge says that there were less than a dozen people watching the fight but the overwhelming evidence is that there were twenty or thirty people. Garrison says that he had been standing on the walk watching the girls fight for about five minutes and "this Merritt bumped into me or I bumped into him." He did not "know who it was that bumped into you at the time." But after the bumping "He stuck his hand in his pocket and I said to him, 'Take your hand out of your pocket,' * * * (t)he next thing I know I heard a big loud explosion. * * * My arm just blowed back behind me. * * * I got two bullet wounds in it." There was only one shot, the bullet hit the back of Garrison's hand and "come out my wrist * * * and come out the back of my arm." The bullet, incidentally, was never recovered. Garrison grabbed his arm and told his cousin "this man had shot me." Garrison testified that he would not have been able to recognize the man again. In fact he did not see Merritt or anyone else shoot at him. Garrison and Merritt had had no prior words and he told "the man" to take his hand out of his pocket because "I just thought maybe he was pulling out a knife or something. * * * He was the only one right in front of me" and the loud noise "had to be in the vicinity" because "I got powder burns all over my knuckles from the shot." He could not and would not say however that he saw Merritt shoot him or even fire a gun. Merritt wore a dark trench coat and Alvin's cousin as well as others all said, "I seen him with his hand in his pocket" but he did not see a gun in his hand. Pool did not know where the explosion came from, "I just assumed." As Warren Gallinger, another patron, started out the door he said that Merritt "told me not to come outside. I stood in the door a little and he acted like he had a gun in his pocket and told me to go back inside." He did not see Merritt "with a gun" and did not see him shoot. The night was chilly and according to Warren hands in pockets was not unusual. He, as with other witnesses, could not say which hand Merritt had in his pocket—and it does not appear whether Merritt is right or left-handed.

Immediately after the first explosion, the shot that struck Garrison, there were three more shots, and they, admittedly, were fired by Bertram Stone, a Negro, who

came out the door and said that he fired into the air because "I was scared, and I was trying to break it up a little bit." He too had bumped into Merritt "and he pushed me out of the way." And in the course of drinking at the bar he said that Merritt "was saying something about three of us (Negroes) robbed him at one time of $583.00 or something." But Bertram says that he did not shoot Garrison or anyone else and he did not see who did shoot him. He saw Merritt "Backing up, with his hand in his pocket" but as to whether Merritt shot Garrison he said, "No, I mean I don't—I didn't see no gun. And that's all I said." The proprietor of the New Orleans Lounge said that as he stepped through the door "this gentleman here fired his gun at the fellow that got shot in the hand and the arm." When asked where Merritt had his gun Fanning said, *"Apparently to me I thought he fired from his coat pocket, but now I don't know."* When Fanning said, "Bill, give me the gun" Bill said, "Get away from me or I will shoot you too." Other witnesses said that Fanning was not outside when the first shot was fired, he heard four shots but did not, as did all other witnesses, see Bertram Stone fire the three shots. In answer to the question "Did you ever see any gun in Mr. Merritt's possession?" Fanning said, "Actually as far as seeing it, no," and again "I couldn't swear I saw it in his hand, no. * * * *All I seen was his left hand in his left coat pocket."* When asked why he "believed" Merritt fired the bullet that struck Garrison he replied, "I figured he had it (a gun), and I know he shot through a coat pocket or something. * * * Put all the facts together, as far as I am concerned personally, he was the only one that was in a range that could have shot the fellow." Fanning was of the opinion that Garrison was trying to help the bartender, Jones, separate the fighting girls. But as to Merritt and the first shot, he saw no gun, no flash from a shot and no hole in Merritt's coat. In conclusion Fanning said, "I am certain he did, but I have no proof he had a gun."

As plainly appears no one saw Merritt with a gun and, obviously, no one saw him fire a gun at Garrison. The state's theory was that he fired through or from his trench coat but no one saw a hole in the trench coat and it was not produced. And, as stated, the bullet that struck Garrison was not recovered. Immediately the police, after a report that someone had thrown a gun over a fence, searched the area and found no gun. Merritt testified that he drank alone at the bar, did not recognize the 25 to 30 people in the street, that when he came out the two women were fighting and "up in front" between the women two men were fighting, he heard the shot "at close range" but did not know where it came from and so he backed up and said, "For Christ's sake, get back inside. Somebody is shooting out there." He said that he did not have a gun and certainly did not shoot Garrison. When he heard the shots he said, "I just raised my hands over my head like this (others too saw this) to let whoever was shooting know that I didn't have a gun or anything. And I started walking to go down the street to my car." The next day he was arrested at his sister's home, he was searched, his car was searched, his sister's home was searched and no gun was found. Merritt said that in the course of the evening he drank eight or ten beers but was not intoxicated, as to how much he drank daily he said, "I can't say, because I just drink consistently to keep a glow on."

At Merritt's insistence all the state's witnesses except Fanning were again called and examined in detail and all police officers were likewise called and examined. One of these witnesses, a patron, was watching the "young ladies" fight and two men in back of him were fighting and he heard a shot and he said, "This older fellow that done the shooting, I presume it was him,—there wasn't no gun in sight, it was shot through the trenchcoat—and he run down the street." He could not recognize the man: "Very doubtful. I was drinking" and "I didn't actually see a gun whatsoever." And finally called by the

defendant was the assistant chief of detectives who said that he took a statement from Garrison and showed him some twelve to fourteen "mug shots" and he said that Garrison "identified Mr. Merritt as being his assailant, the man who had shot him."

Without demonstrating and indicating the elements of the substantive offense these circumstances support the charge of assault with "malice * * * with intent to do great bodily harm." RSMo 1969, Sec. 559.180, V.A.M.S.; State v. Chevlin, Mo., 284 S.W.2d 563. The circumstances as revealed by the record have been thus detailed to place in proper context the essentially meritorious problem involved upon the appeal and that is whether the court prejudicially erred in admitting in evidence exhibit 4, a .32-caliber gun. Appellant's counsel insist that the gun was not properly identified as the gun allegedly found "by the sponsoring witness," Fanning; that it was not connected with the defendant, or "with the crime alleged to have been committed" and was not shown to have been capable of being fired "thereby being a weapon likely to produce death" or great bodily harm.

The problem and objection began even before trial in a rather unusual manner. Both the original and amended informations charged that the appellant Merritt made an assault upon Garrison with a deadly weapon, "to wit: a gun, likely to produce death or great bodily harm." Before trial the appellant filed a "motion for bill of particulars" in which he challenged the allegations of the informations, particularly in that they failed to inform him of certain essential facts with respect "to any particular deadly weapon that he allegedly had in his posesssion and concealed." In this connection he alleged that there was nothing in the magistrate court proceedings to identify or connect with him a weapon. The state in response to the motion filed a reply stating that the bullet was not recovered and "That there was found at the scene of the shooting a .32 Caliber Pistol which the State may or may not seek to introduce into evidence, depending upon whether further investigation by the State indicates that a sufficient foundation for its introduction into evidence at the trial can be established." And the reply stated that the firearm referred to in the two informations, there was then another charge of carrying a concealed weapon, was "one and the same." In his motion for a new trial there are several unnecessarily long objections to the introduction of the gun but they need not be detailed here, it is sufficient to say that "a gun" or precisely "the gun" was a very important piece of evidence and bore particularly upon an essential element of the offense of which Merritt was found guilty "with intent to kill, maim * * * such person." RSMo 1969, Sec. 559.180, V.A.M.S.; State v. Chevlin, 284 S.W.2d l.c. 566.

As plainly and repeatedly indicated, not one of the twenty to thirty people present saw a gun in Merritt's hands or on his person. If he shot through his coat no one saw the flash of gunfire and there was no proof of a bullet hole in his coat. The police searched the area immediately after the shooting and found no gun even though there was a report of a man throwing some object over the fence at a city clearance project. Bertram Stone accounted for the gun he was firing, a .38. Although not accounted for the supposition is that Garrison was shot by a .32-caliber gun. The gun in question was introduced in these contradictory and confusing circumstances: Without identification of the precise time or reason for looking Fanning said that the following day, Sunday, no doubt, he found a gun, "There was some snow laying on the edge of the sidewalk and there was a gun laying there, and I picked it up and took it into the office and I went over to the Chief of Police— they called and asked me to come over for a report on the thing, and I went over there and took the gun to these people. * * * They told me to bring the gun over there and this is what I did. And I would say this is the one I found laying on

the sidewalk in the snow. * * * Let's see. I want to correct myself. They came over and picked it up at the hotel after I had been to the Police Station. This is right. They came over—I don't remember which officer it was but they came over. I drove back over there and they came over and picked it up." Fanning said that when he heard three shots, not as described by all other witnesses, Merritt "had done left. * * * There was somebody down there about a half block north, right across the railroad ground, and there was somebody chasing him, shooting at him." On cross-examination Fanning gave another and different account of finding the gun: "When I walked out to go—let's see. I came out in front and after he had left and drove up and down the street and while I was out there I was trying to figure out whether he was trying to rob us or what the man's motive was for having a disturbance in front of the place. So I walked out to the edge of the sidewalk and looked down, and here is this gun laying in the snow." The first police officer to arrive on the scene testified that Fanning did not claim to have seen the shooting and he did not mention Merritt, "He said that he had not seen anyone shot at the time." Neither this officer nor any other officer found a gun at the scene or in Merritt's personal effects, automobile or on his person when arrested the following afternoon. And as stated not only did Merritt deny that he shot Garrison, he testified that for over five years he had not owned or possessed a gun of any kind.

The sum and substance of the matter is that there is no fact or circumstance from which it is a permissible inference that the gun produced by Fanning belonged to Merritt or was in any manner connected with him or the offense charged. In State v. Holbert, Mo., 416 S.W.2d 129, the appellant was found guilty of carrying a concealed weapon, a .32-caliber revolver. An arresting officer saw a .22-caliber gun in Holbert's shirt pocket and in searching him the officer found the .32 revolver in his hip pocket, and beneath the seat another .22 revolver. All these guns were admitted in evidence and this court in reversing the conviction in 1967 reviewed the relevant cases and said, "These exhibits had no legitimate probative value in establishing defendant's guilt of the offense on trial. * * * And it seems perfectly obvious that their use *throughout* the trial was prejudicial to the defendant." The rationale of the rule excluding such demonstrative evidence need not be again examined here, it is sufficient to say that weapons or other objects when connected with the defendant or the offense charged, when properly identified, are admissible. But such evidence, as the weapon involved here, must meet the tests of relevancy, materiality, probative value and reasons of policy. The prosecutor in State v. Wynne, 353 Mo. 276, 182 S.W.2d 294, a murder conviction, demonstrated with a gun not belonging to the defendant and not connected with the murder. The court pointed out that the gun did not meet the test of policy (4 Wigmore, Secs. 1151, 1157) and for that reason alone reversed the conviction pointing out that "(t)he inherent nature of the weapon was such, under the circumstances of this case, that the jury would undoubtedly have a tendency to infer from a demonstration with it 'the truth of all that is predicated of it' when in fact it had nothing whatever to do with the defendant or the crime." (182 S.W.2d l.c. 300.) In State v. Richards, 334 Mo. 485, 67 S.W.2d 58, another murder conviction was reversed when a gun along with other items found in the home of an accomplice was introduced in evidence. "Upon no theory of law was the property taken from the Wright home evidence against appellant. The record does not contain any testimony that appellant ever possessed or even saw any of the articles mentioned. * * * The evidence was therefore inadmissible for any purpose." In State v. Smith, Mo., 209 S.W.2d 138, the defendant was found guilty of stealing seven type-

writers from the Preston school. When the defendant was arrested his two pistols were found in his wife's purse. The court in that case, after illustrating the instances in which guns and other objects connected with the defendant or the offense were admissible, reversed the conviction because the introduction of these "lethal weapons" was erroneous and prejudicial. Other cases reversing convictions because of the erroneous admission of demonstrative evidence are State v. Schleicher, Mo., 438 S.W.2d 258 and State v. Bray, Mo.App., 278 S.W.2d 49. Compare instances in which weapons and other articles have been properly identified, State v. Small, Mo., 344 S.W.2d 49, State v. Kern, Mo., 447 S.W.2d 571. As was said in a civil case, "'* * * the gun that we taken off of Doc Cowan.' It had been in his or his successor's possession since being taken from defendant at the road near the lake. Defendant stated that it was the gun with which he shot plaintiff. It was admissible, probative, demonstrative evidence on the disputed issue of alleged intentional shotgun assault and wounding of plaintiff by defendant." Chism v. Cowan, Mo., 425 S.W.2d 942, 947.

In this disposition of the appeal it is not necessary to consider other claims of error even though attention should be called to the fact that insofar as the second offender law is involved the court made no findings of fact. The state charged a single prior conviction and as to that its proof was wholly unsatisfactory even though the defendant in testifying in his own defense admitted numerous other felonies not charged. State v. Peterson, Mo., 305 S.W.2d 695; State v. Beckemeyer, Mo., 423 S.W.2d 687. In short, the record in this case does not meet the minimal requirements recently established by the court en banc in State v. Blackwell, Mo., 459 S.W.2d 268, and State v. Ellifrits, Mo., 459 S.W.2d 293.

For the indicated error, manifestly prejudicial to the appellant's right to a fair trial, the judgment is reversed and the cause remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

DONNELLY, P. J., and MORGAN, J., concur.

FINCH, J., concurs in result.