**STATE of Missouri, Respondent,**

v.

**Joe Louis EALEY, Appellant.**

**No. KCD 26910.**

Missouri Court of Appeals,
Kansas City District.

Nov. 4, 1974.

Willard B. Bunch, Public Defender, Paul Crider, Jr., Asst. Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Donald R. Bird, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

Appellant, herein designated as defendant, was convicted by a jury of statutory rape of one M——— K——— C———, age 14. The jury was unable to agree upon a sentence and the court sentenced him to forty (40) years in the custody of the Missouri Department of Corrections. This is a direct and timely appeal from such judgment and sentence.

The defendant raises two points of error on this appeal.

*First,* he asserts that the trial court erred in overruling his motion to suppress in-court identification by M——— K——— C——— and M——— F——— L———, for the reason that such identification was tainted by the suggestive influences of prior and subsequent photographic identification and an improper line-up identification by those witnesses.

*Second,* he asserts that the trial court erred in permitting the prosecuting attorney to make reference to and demonstrate with a Panama hat never identified as belonging to the defendant, but which demonstration and reference connected the appellant with the crime in that the assailant wore a Panama hat similar in appearance.

A resolution of these points requires a summary of the basic facts and particular evidence and trial incidents bearing on each of them.

On May 29, 1970, M——— K——— C——— was a freshman in high school, then fourteen (14) years of age. She and her friend, M——— F——— L———, also fourteen (14) years of age, were walking in the vicinity of 54th and Harrison in Kansas City, Missouri at approximately 10:00 p. m. This is a residential district in which both girls lived. A car stopped at the curb, with its lights off, and the girls kept walking. The next thing M——— K——— C——— noticed was the feel of a hand on her shoulder and a gun being held to her head, and a man told both the girls to get into the car or he would kill her. The girls got into the back seat of the car and were told to get on the floor and to keep their eyes closed. The man then drove north on Harrison and then turned east, but kept circling so that M——— K——— C——— lost track of where they were.

Thereafter, the man parked the car in a vacant lot, told the girls he was going to rape them, put M——— F——— L——— in the trunk of the automobile, directed M——— K——— C——— to take off her underwear, removed his Bermuda shorts and hat, and raped M——— K——— C——— in the back seat of the car. The man then said he was going to do the same thing to M——— F——— L——— and would lock M——— K——— C——— in the trunk. He·was dissuaded from doing this and after a while he released M——— F——— L——— from the trunk, put both girls on the floor of the back seat, told them to stay down and keep their eyes closed and he would take them back to where he had picked them up. He did drive them back to 53rd and Harrison and released them. The girls immediately went to a friend's house on Harrison, M——— K——— C———'s parents and the police were notified, and she was taken to Menorah Hospital, where the fact of rape was medically established and she was given medical attention.

The defendant filed a motion to suppress any in-court identification of the defendant. Evidence was heard on this motion, out of the presence of the jury, and it was overruled by the trial court. This action by the court below is urged as error on this appeal as defendant's first point. The basis of this claim is that both girls tentatively identified defendant from photographs and positively identified him in a line-up, before their in-court identification at trial and, defendant asserts, that such prior identification procedures were so "impermissibly suggestive" as to give rise to a "very substantial likelihood of irreparable misidentification" in court within the proscription of Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247 (1968).

*Simmons* stands for the propositions that (1) each case must be decided on its own facts; and (2) evaluated in the light of the totality of the circumstances of each case. Further, *Simmons* holds that the rationale of such an approach necessarily demands that consideration be given to 1) the presence of an independent basis of identification; 2) the absence of any

suggestive influence by others; and 3) positive courtroom identification. Missouri decisions are in accord. State v. Walters, 457 S.W.2d 817 (Mo.1970); State v. Grimm, 486 S.W.2d 427 (Mo.1972); State v. Neal, 484 S.W.2d 270 (Mo.1972); State v. Shumate, 478 S.W.2d 328 (Mo.1972).

This record reveals that on June 1, 1970, following the rape, M——— K——— C——— and M——— F——— L——— went to police headquarters and separately were shown "quite a few" photographs, fifty (50) to one hundred (100) in number. M——— K——— C——— picked out one photograph and M——— F——— L——— picked out two photographs, but neither girl made any positive identification from their initial viewing of the photographs.

■ On October 8, 1970, both girls were asked to come to police headquarters to view a line-up. They were separated and both picked the defendant from the four-man line-up as the person who had abducted them and raped M——— K——— C———. While M——— K——— C——— did not recall the occasion, she was shown about 10 photographs at sometime after the line-up and again picked out defendant and was told that that was the same man she had seen in the line-up.

M——— K——— C——— described her assailant as a Negro male, with a goatee and mustache, and completely bald. Defendant complains that dissimilar individuals were included in the line-up of October 8, 1970, specifically that one of the men had a full head of hair. This does not constitute a valid challenge to the propriety of the line-up. Gaitan v. State, 464 S.W. 2d 33, 35 [3, 4] (Mo.1971). The complaint regarding this line-up is without merit.

■ This record is completely devoid of any evidence that either the photographic identification or the subsequent line-up identification were accompanied by or coincident with any improper suggestions, leads, hints or actions, by the police or by anyone else, which tainted such identification, and thus in turn corrupted the in-court identification. Also, it is no longer open to argument in Missouri that, even though the photographic or line-up identifications are tainted or in some way suggestive, where there is an untainted, positive in-court identification made upon a factual basis independent from such photographic or line-up procedures, such in-court identification is proper. Simmons v. United States, supra; State v. Walters, supra; State v. Carey, 486 S.W.2d 443 (Mo. 1972); State v. Brownbridge, 459 S.W.2d 317 (Mo.1970); State v. Ramsey, 477 S. W.2d 88 (Mo.1972).

Both M——— K——— C——— and M——— F——— L——— asked Mr. Speck, the assistant prosecutor, to show them the courtroom where the trial would take place, because they had not been in a courtroom before and M——— K——— C——— was apprehensive about confronting her assailant. About a week before the start of the trial, Mr. Speck took them to the courtroom and at their request showed them where everyone would be seated, including court personnel, and the defendant. However, both girls unequivocally, emphatically and positively identified the defendant in court, and both based such identification upon a strong independent basis within the *Simmons* rule.

M——— K——— C——— testified:

"Q. All right, K———. During all this time, did you get a look at his face?

A. Yes, sir, I did, when he was on top of me I got a pretty good look at his face.

Q. Did you get a chance to look at his face for very long at that time?

A. It seemed like a long time.

Q. Were there any other times during this experience when you got a look at his face?

A. He turned around occasionally to talk to us on the way to where this happened, and when we got to the

scene, he turned around and was talking to both of us.

Q. Now, were you sitting up at that time?

A. I was—I was kind of half sitting up, half laying (sic) on the floor.

Q. Were you in a position where you could see his face when he turned around and talked to you?

A. Yes.

Q. All right. When you were being raped, and the other times when he turned around, was there sufficient light that you could get a clear look at his face?

MR. FOX: Objected to as leading.

THE COURT: The objection will be overruled.

Q. (By Mr. Speck) You can answer.

A. Okay. The car door was open on the driver's side, and there was a light from the —— underneath the steering wheel, I believe, somewhere down there, that gave enough light so I could see what was going on. I could see him very clearly.

Q. Did you see his facial features clearly?

A. Yes.

* * * * * *

Q. K——, do you know where the defendant sits in this courtroom?

A. Yes, sir.

Q. Would you look at him, please, and tell the jury if you recognize him?

A. Yes. He is the man who raped me.

Q. Is he the man you identified at the line-up?

A. Yes, sir.

Q. Has anyone told you or suggested to you who to identify in this case?

A. No.

Q. Is there any doubt whatsoever in your mind that this defendant, Joe Louis Ealey, is the man who abducted you and raped you on May 29, 1970?

A. No. I am positive that he is the man."

M—— F—— L—— testified:

"Q. All right. Now then, up to now, did you get an opportunity to get a look at this man?

A. I saw him when he first picked us up, because we were very close to a street light, and I could get a look at him then. As he turned to K——, when we—after we had been driving and stopped, when he turned around, I saw him again.

Q. All right. M——, what did he look like?

A. He was a black man, at the time he had a hat on.

Q. What did that hat look like?

A. The only way I could think of it, to describe it, would be a Panama-type hat.

* * * * * *

Q. Did it have a band on it?

A. Yes. It had a flowered, paisley-type band around it.

* * * * * *

Q. Okay. Did the man have any facial hair?

A. Yes, sir. He had a moustache and a goatee.

Q. Did you ever see him with his hat off, M——?

A. I did not.

Q. Were you able to tell how big he was?

A. I approximated his size in relationship to the size of my brother, who was about the same size, when he stood next to K——, and I later told the police I thought he was between six-foot-one and six-foot-two and close to 200 pounds in weight.

Q. Did you give any estimate of what you thought his age was?

A. I believe I said late twenties.

Q. Now, was there anything else that you were able to notice about him when you got a look at him?

A. Oh—the only other characteristic I noticed was that his nose was very wide.

Q. Now, at any time, were you trying intentionally to remember what he looked like, to get a look at him?

A. Yes, sir, I was.

Q. Why was that?

A. Well, when something like that happens, you try to remember—or I tried to remember, so that afterwards, I could recall and give a description to the police, in hopes that the man would be caught."

M—— F—— L—— further testified in response to the question, "Do you recognize the defendant?"—.

"A. Yes, sir, I do.

Q. Where do you recognize him from?

A. From the night that he picked K—— and me up and raped K——.

Q. Is this the same man you identified in the line-up in October of 1970?

A. Yes, sir, it is.

Q. M——, are you absolutely sure that the defendant, Joe Louis Ealey, is the man who abducted you and raped K—— C——?

A. Yes, sir, I am.

Q. Is there any doubt in your mind that this is the man?

A. No, sir, there is not."

Judged upon the facts as shown by the record, and taking into consideration the totality of the circumstances, the identification procedures utilized in this prosecution were eminently fair. This, coupled with the all-important independent basis for the in-court identification, compel the conclusion that defendant's first point relied upon is without merit.

■ Resolution of the defendant's second point requires a somewhat detailed review of the defense theory of this case and of the trial incidents relating to the Panama hat. Both M—— K—— C—— and M—— F—— L—— testified that their abductor wore a Panama hat with a band of paisley print on the night of May 29, 1970. At the line-up in October, 1970, a Panama hat resembling the hat worn by their abductor was placed on the head of each of the men in the line-up. M—— K—— C—— testified, however, that she identified the defendant in the line-up before the hat was placed upon his head.

The defendant testified in his own defense as did his wife and two other witnesses. In summary, he denied any connection with the abduction and rape and sought to establish the alibi that at the time there of he was engaged, with other persons, in painting his brother-in-law's basement.

Defendant was arrested on October 8, 1970 and his Buick automobile was taken to police headquarters. The two girls involved were shown the automobile at police headquarters and identified it as the vehicle involved in the rape. At the trial, they

identified five photographs of the automobile as they viewed it on that occasion, one of which (State's Exhibit No. 1) shows a Panama hat, with paisley band, on the console between the two front seats. They were both subjected to vigorous cross-examination as to variances in their descriptions of the car, given following the rape, and the appearance of the car, both interior and exterior, as shown in the photographs. The defendant and his wife also testified as to discrepancies in these descriptions.

There was, however, no viable issue made that the car photographed in October, 1970, was not in fact the Buick owned by defendant at the time of the rape. One of the photographs showed a license plate admittedly issued to the defendant.

Up to this point in the trial, so far as the transcript shows, no Panama hat had been physically "demonstrated" to the jury. On this point, the trial incidents, *first developed in the direct examination of the defendant* by his own counsel, disclose the following:

"Q. Okay. Have you ever owned a Panama hat with a paisley band?

A. No.

Q. Do you know what that is?

A. Yes, I know. I've never owned a Panama hat.

 *  *  *  *  *  *

Q. Did you own any summer hats in May of 1970?

A. No.

Q. Do you ever wear a hat?

A. No. In the wintertime I wear a hat."

On cross-examination by the prosecutor, the defendant was shown the picture of the interior of the car where a Panama hat is visible and admitted that the car's interior looked like his, and he was then questioned:

"Q. Mr. Ealey, you'll notice that there is a straw hat with a paisley band sitting (sic) in there on the console between the seats.

A. Yes, sir.

Q. Is that your straw hat?

A. No. I don't have a straw hat.

Q. You've never seen that straw hat before, I don't suppose?

A. I don't have a straw hat."

The record then shows that State's Exhibit No. 7 was marked for identification. The following then appears as part of the cross-examination:

"Q. I'll hand you State's Exhibit 7, Mr. Ealey. Now, *that's the hat that you left in your car when you were arrested—*

Mr. FOX: Just a minute. I object to counsel's statement, that's the hat you left in that car, *he never owned a hat like that before in his life.*

Q. (By Mr. Speck) The question is, that's the hat in the car, isn't it?

A. I never saw that hat before.

Q. And the hat has a paisley band, does it not?

A. Yes.

Q. Very much like the hat in the picture, which is sitting (sic) between the two seats of the car?

A. That hat looks white to me. That hat right there looks brown.

Q. Right now we're talking about the paisley band.

A. Oh, yes." (Emphasis supplied)

The prosecutor made no offer of the hat (State's Exhibit No. 7) into evidence at that or any subsequent time.

However, on *direct examination* of the defendant's wife, the following appears:

"Q. Now, here's *an old hat that somebody's dragged up from some place.* Have you ever seen it before?

A. No, I haven't. (Emphasis supplied)

An objection to the comment "dragged up from somewhere" was sustained and, after a colloquy out of the hearing of the jury, during which defense counsel requested that the court instruct the jury that the hat was not in evidence, the request was denied. The following then occurred:

"Q. (By Mr. Fox) Did Joe Ealey ever even have a hat that resembled that?

A. No.

Q. Pardon?

No.

Q. Have you ever seen it before?

A. No, I have not."

The prosecutor carefully avoided any direct "reference" to or "demonstration" of the physical hat (State's Exhibit No. 7) during the balance of the testimony or in his closing argument.

However, in his closing argument, counsel for defendant vigorously argued that the identity or ownership of the hat had never been established nor had the hat been offered in evidence.

In support of his position that prejudicial trial error occurred in the foregoing trial incidents, defendant relies upon the decisions of State v. Wynne, 353 Mo. 276 182 S.W.2d 294 (1944) and State v. Merritt, 460 S.W.2d 591 (Mo.1970). Neither of these decisions is in point. In *Wynne,* the prosecutor, in a murder trial, was allowed to conduct a demonstration as to how far a gun protruded from the pocket of the murder victim's husband (not the defendant). In order to do this, he used a hand gun which it was agreed had no connection whatever with the defendant nor with the case. The court in *Wynne* held that such a demonstration of a lethal weapon was highly prejudicial because (among other reasons), quoting from 4 Wigmore, Evidence, Section 1157, p. 340, "the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence."

In *Merritt,* a case involving a charge of assault with intent to kill by means of a hand gun, it was held that it was reversible error to *admit into evidence* a hand gun where there was "no fact or circumstance from which it is a permissible inference that the gun" belonged to the defendant "or was in any manner connected with him or the offense charged".

In the case at bar, the Panama hat was marked as an exhibit only during the cross-examination of the defendant who had categorically denied ever owning such a hat, on direct examination. The hat, of course, was not a deadly weapon likely to "overwhelm reason" (as in Wynne and Merritt) nor was it offered or received in evidence (as was the gun in Merritt). The extent of the prosecutor's "demonstration" was to exhibit the hat to the defendant who again denied ownership and there, apparently, the matter would have rested. However, defense counsel again exhibited the hat before the jury in his direct examination of defendant's wife.

Under the well-established rules, as exhaustively reviewed in State v. Scown, 312 S.W.2d 782 (Mo.1958), where the defendant made a sweeping denial of ownership of any Panama hat, the whole subject matter thereof was opened and it was within the realm of permissible cross-examination to ask him specifically with regard to the hat marked State's Exhibit No. 7, so that the jury could judge the credibility of his denial, under all the facts and circumstances of the case. Such did not consti-

tute reversible error; the trial court did not abuse its discretion in permitting this cross-examination; and, therefore, the defendant's second point is ruled against him.

The judgment is affirmed.

All concur.