STATE of Missouri, Respondent,

v.

Joe Louis EALEY, Appellant.

No. KCD 26908.

Missouri Court of Appeals,
Kansas City District.

Feb. 3, 1975.

Willard B. Bunch, Public Defender, Kansas City, Clifford A. Cohen, Certified Law Intern, for appellant.

John C. Danforth, Atty. Gen., Donald R. Bird, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

Appellant, herein designated as defendant, was convicted by a jury of statutory rape of one J——— S———, aged 13 years. The jury was unable to agree upon a sentence and the trial court sentenced him to forty (40) years in the custody of the Missouri Department of Corrections. This is a direct and timely appeal from such judgment and sentence.

The defendant makes two points of error in his brief.

*First,* that the court erred in overruling his objection to the introduction of fingerprint evidence obtained in the course of a constitutionally impermissible search and seizure of the defendant's automobile, without a warrant, without his consent, and after his arrest. In his reply brief in answer to the state's brief, he asserts that the introduction of the fingerprint evidence illegally obtained was not harmless but is reversible error under Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967).

*Second,* the defendant asserts that the court erred in overruling defendant's motion to suppress the victim's in-court identification of the defendant because such was tainted by suggestive influences of prior photographic identification and a lineup *identification wherein dissimilar in-* dividuals were included with defendant.

A resolution of these points requires a somewhat detailed summary of the evidence.

On October 3, 1970, J——— S——— and J——— H———, her date, were walking from Southwest High School in Kansas City to J——— H———'s home, about two blocks from the school. They had attended a school dance that evening and were walking in a residential section shortly before midnight. On the way, a car stopped near the couple and a man got out and approached them with a gun in his hand, which he placed against the head of J——— H——— and ordered them to lie down on the ground behind some adjacent bushes. He threatened to kill them if they did not keep quiet. He then picked up J——— S——— by her hair and took her to the automobile where he forced her to lie down in the back seat. He told J——— H——— that if he did not remain there for five minutes, he would kill J——— S———. As J——— S——— and her abductor entered the automobile, J——— H——— crawled through the bushes and viewed the rear of the car as it proceeded down to the corner and turned. He was able to obtain the first three letters and numbers of the license number. He then ran to a neighbor's home and the police were called. They arrived within ten minutes and J——— H——— gave them a description of the man, the car and three letters and numbers of the license plate, one of which he recalled was the letter "G". Thereupon, J——— H——— and police officers engaged in a fruitless search for the car. He was with these officers when J——— S——— was found at Lee's Summit a few miles south of Kansas City later that morning. J——— H——— was unable to make any positive identification of the defendant from photographs or at the lineup.

J——— S——— testified that after she was forced into the back seat of the car, her abductor drove for about ten minutes, then pulled the car into a gravel driveway, stopped, got out of the car, opened a garage door and drove the car into a lighted garage. She was then taken from the car to an upper room in the vacant house and raped upon a mattress on the floor.

After the rape, J—— S——'s abductor took her back to the automobile in the garage and forced her to again lie down in the back seat. He then drove off and after only a minute or two, J—— S—— noticed a bright light shining into the interior of the car and her abductor sped away. During the chase that followed, J—— S—— heard a "bang" every once in a while and at one point the car hit a dip at high speed and she was thrown up in the air from the rear seat and she looked out the rear window. Her abductor let her out at Lee's Summit, she flagged down a truck and the driver turned her over to the Lee's Summit police. She was taken to the Baptist Memorial Hospital where she remained three days. There is no dispute that she had been sexually violated.

The evidence disclosed that the house where the rape occurred was one which had been rented by the defendant and his wife, and only recently vacated. J—— S—— told the police that the garage had red painted walls and a bar-like arrangement at the rear, upon which she observed a bottle and a gun; that she was taken from the garage up a flight of stairs to a kitchen which had a brick-walled appearance with a wall telephone and a light switch on one side of the entrance; she was taken down a hallway to the room where the rape occurred and noticed a den and bath leading from the hallway. After her release from the hospital following the rape, she accompanied officers to the home, previously rented by defendant, and identified the gravel driveway, garage door, garage and the red walls and bar, the stairs, the telephone and light switch, kitchen, den, bathroom and the room and mattress where the rape occurred.

She also gave the police a description of her abductor and of the automobile he was operating, and later identified the defendant and the automobile as hereafter related.

Patrolman Floyd E. Foster, assigned to the Tactical Unit of the Kansas City, Missouri police department, testified that he was cruising the south part of Kansas City with his partner in an unmarked police car the night of October 3–4, 1970. They had received a broadcast over the radio giving a description of the car and driver involved. At approximately 1:00 A.M., October 4, 1970, they spotted a car at 69th Terrace and Olive fitting the description. This car passed in front of the police car at the intersection, and the police spotlight was turned on the driver. The witness was able to see the driver's face clearly and he recognized the driver but could not recall his name. Police turned on the red flashing lights and attempted to stop the car, but it sped away with the police in pursuit. Patrolman Foster said it appeared that a shot was fired from the car at the following police car, and he fired three shots at the fleeing vehicle. At that time, he thought the driver was the only occupant of the car, but when the car hit a dip at high speed, he saw the figure of a white female bounce up from the back of the car and he fired no further shots. The fleeing vehicle escaped at speeds up to 100 miles per hour.

The morning of October 5, 1970, at police headquarters where Foster had gone to review some police photographs to refresh his memory of the name of the driver whom he had recognized but could not name, he spoke to Detective King and he, King, mentioned the name of the defendant as a suspect. As soon as the name was mentioned, Foster placed the name with the face of the man operating the car which he and his partner had pursued on the morning of October 4, 1970.

On October 7, 1970, Foster and his partner established a surveillance on the defendant's residence at 3318 East Meyer Boulevard, Kansas City, Missouri, at about 9:30 P.M. At about 12:30 A.M. on October 8, 1970, the officers approached the garage on foot and looked into the garage and by the beam of a flashlight saw the automobile they had been chasing on the morning of October 4, 1970. The license number was

GR/9766, which witness Micke of the Department of Revenue, Motor Vehicle Division of Missouri, testified had been issued to the defendant.

Foster went back to the police car and radioed for additional help to cordon off the residence. When this was done, he knocked on the door; the defendant's wife responded and told the officers she was alone (although they had seen a man's silhouette in a window during the surveillance); the officers told the defendant's wife that they were policemen and that they would force their way into the house if she did not open the door and that they wanted her husband for abduction and rape; the wife then opened the door and they found the defendant sitting on a bed. He was placed under arrest, and advised of the charge of abduction and rape, and given the Miranda warning. Foster had the Buick Riviera which was in the defendant's garage towed to the police garage where it was photographed and later that morning examined for fingerprints. It was necessary for the defendant's wife to move a Chevrolet automobile out of the driveway so that the Buick could be towed. Foster identified the photographs of the automobile, bearing license number GR/9766, issued to defendant, as the vehicle he had fruitlessly pursued and the car he had towed to the police garage. He also made a positive in-court identification of the defendant as the man who had been driving the car during the chase.

Detective John King of the Crimes Against Persons Unit of the Kansas City police department was assigned to this case on the morning of October 5, 1970. He received a description of the abductor-rapist and of the automobile involved from the other officers initially on the case as the same had been given to them by J——— S——— and J——— H——— and decided that a possible suspect was the defendant, about whom he had prior knowledge. The last known address of the defendant was 3118 East 63rd Street, Kansas City, Missouri, and he went to that address

and found the house vacant. He secured a key from the realty company and went into the house to check its interior against the description previously given the police by J——— S———. The description related by J——— S——— checked in every detail with his observations. The real estate agent in charge of the property testified that it had been rented by the defendant and his wife through September, 1970.

Detective King testified that he took eight police photographs to the hospital while J——— S——— was there. One of these was a photograph of defendant. J——— S——— made an identification of one of these photographs, which photograph he testified (on cross-examination) was that of the defendant. When J——— S——— was released from the hospital on October 7, 1970, King took her and her mother to the vacant house at 3118 East 63rd Street and J——— S——— identified the house as the place where the rape occurred.

On October 8, 1970, at 10:40 A.M., after the defendant's arrest, King conducted a lineup consisting of four men at police headquarters, one of whom was the defendant. King described this procedure in detail and the record contains photographs of the lineup involved. J——— S——— made an identification of the defendant at the lineup. Following the lineup, King had J——— S——— view the automobile which had been towed to the police garage earlier that day from the defendant's home. He specifically instructed J——— S——— only to look at the car and to keep away from it and not touch it, and she complied. She identified the car as the one in which she was abducted.

King testified that he also interviewed the defendant and gave him the Miranda warning. At this interview, one of defendant's attorneys was present. The defendant stated that he had lived at the Meyer Boulevard residence for about a month; that prior to that, he had lived at the 63rd Street residence; that he had retained keys to the 63rd Street house until

October 5, 1970, when his wife mailed them back to the real estate agent; and, that· only he and his wife ever drove the Buick automobile.

Gary Howell, Chief Chemist of the Regional Center of Criminal Justice, testified that he had conducted some chemical tests on stains found on a mattress cover in the house at 63rd Street and that they were human blood, Type A, and seminal stains intermingled. He testified that about 40% of humans have Type A blood. The state established by hospital records that J———— S———— has Type A blood.

Ray Bowman testified that in October of 1970, he was assigned to the identification unit of the police department and had been so engaged for 11½ years. His qualifications included the lifting of latent fingerprints and the comparison thereof for identification purposes. He processed the house on 63rd Street for latent prints at the request of Detective King, but was unable to develop any.

On October 8, 1970, at 8:30 A.M., he processed an automobile at the police garage, which he identified from photographic exhibits (theretofore established as the defendant's Buick) and as a result developed six latent prints which, by comparison, he identified as fingerprints of J———— S————. He developed 4 of these as prints of her right hand found at the top of the door glass on the left hand (driver's) side *on the outside of the glass*. The remaining two prints were developed from the inside surface of the right door. He testified unequivocally that all of these six prints were made by J———— S————'s fingers and *without any possibility of error*.

With reference to the defendant's motion to suppress the in-court identification of defendant by J———— S————, the evidence offered both on the hearing of the motion, ·outside the presence of a jury, and at the trial, may be summarized as follows:

J———— S———— was taken to Baptist Memorial Hospital in the early morning of October 4, 1970. On October 5, 1970, Detective King went to the hospital with some police photographs for her to view. He was denied access to her room by a nurse since he did not have her doctor's permission. Later that day, he was permitted to see her and he showed her eight photographs. Both J———— S———— and King testified that she ·identified the picture of defendant as her attacker. King then told her that she had selected the photograph of the defendant, Joe Louis Ealey.

While the evidence from this point is at best somewhat unclear and conflicting, it can be fairly stated that after J———— S———— made this identification and until she was discharged from the hospital on October 7, 1970, she discussed this with a Licensed Practical Nurse assigned to her floor named Carolyn Mitchell, and with a Nurse's Aid named Judy Anderson, both of whom asked her on numerous occasions if she was "sure" of her identification and inferentially, at least, cast some doubts in her mind.

It developed that Carolyn Mitchell was the sister-in-law of the defendant and that she and Judy Anderson were on friendly terms as co-workers. While Carolyn Mitchell denied any attempt to influence the identification by J———— S———— and testified that she did not even know of her brother-in-law's involvement until the morning of his arrest, Judy Anderson testified that Mitchell was "very upset" about J———— S————'s identification 3 days after her admittance to the hospital, which would be at the latest on October 6–7, 1970.

One further facet of the evidence is pertinent to the points of error. Officer Foster, when interrogated as to his reasons for having the defendant's automobile towed to the police garage, stated that he desired to preserve evidence, "to have it processed for prints and any other tangible evidence in connection with this crime", and that he did not want Mrs. Ealey "wiping the fingerprints off if there were any in the car".

Considering defendant's points relied on in reverse order, his second point is ruled against him. His argument is apparently based upon the theory that the court erred in refusing to suppress J——— S———'s in-court identification of the defendant for the reason that it was tainted by "suggestive influences" stemming from earlier photographic and lineup identification.

As previously stated, J——— S——— identified the defendant from a number of photographs exhibited to her at Baptist Memorial Hospital on October 5, 1970. She freely admitted that during her stay at the hospital following this identification she told Carolyn Mitchell, her mother and Detective King, that she was "not sure" or "couldn't be sure" in her identification of the defendant and that on one occasion she cried in Carolyn Mitchell's arms and said she was sorry she had identified defendant as the person who had raped her.

J——— S——— was again confined in Baptist Memorial Hospital as a patient in the latter part of October, 1970 (for reasons which counsel stipulated were unrelated to this case), at which time she did not see Carolyn Mitchell, but was told by Judy Anderson that she, Anderson, had "learned" that the defendant could not have been guilty of the rape because at the time he was at a "house warming" party which lasted until 3:00–4:00 A.M.—the alibi defense ultimately put forward at the trial.

■ There is not the slightest evidence in this record that Detective King's presentation of the police photographs to J——— S——— at the hospital on October 5, 1970 was accompanied by any improper suggestion or action which would influence J——— S——— toward the selection and identification of the defendant as her attacker, which could taint such identification and thus, in turn, influence the subsequent lineup and in-court identification. The admitted fact that J——— S——— had expressed herself as not absolutely sure of her identification of the "mug" shot of this defendant is completely understandable,

particularly in view of the fact that she was a 13-year old girl who had undergone a terrible physical and psychic trauma and who had been importuned by Carolyn Mitchell and Judy Anderson, her nurses whom she considered her friends, to be "sure". If the identification by J——— S——— of the defendant at this stage was tainted at all, the jury could well have concluded that such taint had its source in the actions of Mitchell and Anderson and not those of Detective King. Certainly there is no basis in the record to conclude that the procedures employed by Detective King with reference to the photographic identification of the defendant were "impermissibly suggestive" so as to give rise to a "very substantial likelihood of irreparable misidentification" within the proscription of Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) and Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

J——— S———'s identification of the defendant in the lineup on October 8, 1970 was definite, positive and unequivocal. Here again there is a complete absence of any evidence of influence or suggestion by the police or anyone else.

■ But defendant attacks the methods and procedures employed in the lineup, principally for the reason that "dissimilar individuals were included with appellant". This court has recently reviewed the propriety of this *very* lineup involving the same defendant and three other individuals where the defendant was identified in another crime and where the *same* charge of impropriety was raised, and held that there was no merit to this position. State of Missouri v. Ealey, Mo.App., 515 S.W.2d 778 (decided November 4, 1974). No additional facts appear in this matter to compel a different conclusion than was reached in the earlier appeal.

Likewise, J——— S———'s in-court identification of the defendant was definite, positive and unequivocal, and was not shaken by a most vigorous and probing

cross-examination. The record abounds with facts which would form an independent basis for this in-court identification of the defendant arising during J——— S———'s abduction, subsequent rape, flight from police and discharge from defendant's car at Lee's Summit, as above related.

■ Simmons v. United States, *supra,* stands for the principles that each case, such as the one at bar, must be decided upon its own facts and evaluated in the light of the totality of the circumstances of each case. *Simmons* also holds that the guidelines for application of such principles demand that consideration be given to (1) the presence of an independent basis for identification; (2) the absence of any suggestive influence by others; and (3) positive courtroom identification. Missouri decisions are in accord. State v. Walters, 457 S.W.2d 817 (Mo.1970); State v. Grimm, 486 S.W.2d 427 (Mo.1972); State v. Neal, 484 S.W.2d 270 (Mo.1972); State v. Shumate, 478 S.W.2d 328 (Mo.1972); State v. Ealey, 515 S.W.2d 778 (Mo.App. 1974). Further, the rule in this state is now clear that even if the photographic or lineup identification is tainted or in some way suggestive (not shown in this record), a positive, untainted in-court identification made upon a factually independent basis is properly admitted. State v. Carey, 486 S. W.2d 443 (Mo.1972); State v. Brownridge, 459 S.W.2d 317 (Mo.1970); State v. Ramsey, 477 S.W.2d 88 (Mo.1972); State v. Ealey, 515 S.W.2d 778 (Mo.App.1974).

■ The trial court did not commit error in overruling defendant's motion to suppress J——— S———'s in-court identification of him as the person who abducted and raped her.

Defendant's first point charges the trial court with error "in overruling appellant's objection to the introduction" of fingerprint evidence obtained in the course of a constitutionally impermissible search and seizure of defendant's automobile. The evidence referred to is that of Officer Bowman, summarized above.

Defendant first filed his motion to suppress this evidence and the trial court properly held an independent and separate hearing on the issues thus raised, since such were collateral to the issue of defendant's guilt. State v. Dalton, 23 S.W.2d 1, 5 [6] (Mo.1929). After a lengthy evidentiary hearing, the motion to suppress was denied. At the trial of the guilt issue before the jury, the testimony of Officer Bowman and exhibits in support thereof were offered by the state and received in evidence without further objection by the defendant upon the ground now asserted in his first point.

■ It has long been the rule in this state that where defendant raises the point of unreasonable and unconstitutional search and seizure, he must assert this position by 1) filing a motion to suppress the evidence obtained as a result of such search and seizure; and 2) if unsuccessful, he must keep the issue "alive" by objection to the introduction of the evidence involved at the trial on the issue of guilt; 3) assert the error in his motion for a new trial; and 4) preserve the same on appeal. State v. Tunnell, 302 Mo. 433, 259 S.W. 128, 130 [5] (Mo. banc 1924); State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878, 887 [15] (Mo.1942); State v. Simone, 416 S.W.2d 96, 100 [11] (Mo.1967); State v. Bryson, 506 S.W.2d 358, 360 [2] (Mo.1974); State v. Yowell, 513 S.W.2d 397, 402 [1, 2] (Mo. banc 1974).

■ This record shows that defendant did not in fact keep the issue of the alleged unlawful search and seizure "alive" by objection at the trial of guilt to the introduction of the fingerprint evidence, and there is no showing of any element of "surprise" (the only exception to the rule requiring preservation by objection).

It is clear, therefore, that defendant's first point was not properly preserved under the stern mandate of the foregoing authorities.

No request is made by the defendant that the matter of the search and seizure and the introduction of the fruits thereof be considered by this court as plain error under Rule 27.20(c), V.A.M.R. The court declines to do so *sua sponte,* as it is apparent that no manifest injustice or miscarriage of justice has occurred.

The judgment is affirmed.

All concur.